[Sac. No. 4500. In Bank.—March 31, 1931.]

THE PACIFIC CO., LTD. (a Corporation), Appellant, v. CHARLES G. JOHNSON, State Treasurer, etc., Respondent.

Miller, Chevalier, Peeler & Wilson and Melvin D. Wilson for Appellant.

U. S. Webb, Attorney-General, H. H. Linney, Deputy Attorney-General, and Frank L. Guerena for Respondent.

WASTE, C. J.—Plaintiff seeks to recover certain taxes paid under protest and alleged to have been unconstitutionally exacted. Defendant's general demurrer to the complaint was sustained without leave to amend. From the judgment thereafter entered plaintiff prosecuted this appeal, urging the invalidity of those portions of the Bank and Corporation Franchise Tax Act (Stats. 1929, chap. 13, p. 19), which provide for and require the inclusion of interest from "federal, state, municipal or other bonds" in the net income base by which the state franchise tax of banks and corporations is measured. The importance, both to the taxing power and the taxpayer, of a proper determination

of this issue prompts us to briefly review the history of state taxation, in order that a complete understanding may be had of the origin of the statute here assailed, the principles underlying it, and the legal and economic factors that made imperative its enactment. The materiality of such investigation will subsequently appear.

Prior to 1910, state revenues were derived mainly from a direct *ad valorem* property tax levied upon all taxable property within the state. Under this system, corporate property was subject to both state and county levies, and in time the method was found to be unsatisfactory, burdensome, and, in some cases, inequitable. (*Pacific G. & E. Co.* v. *Roberts*, 168 Cal. 420, 423 [143 Pac. 700].) This led to the creation of a commission whose task it was to study the situation and suggest a remedy. The plan proposed by this commission was adopted in 1910 (sec. 14, art. XIII, Const.), and certain corporations were thereupon placed in a class apart and their franchises taxed exclusively for state purposes. Under this constitutional amendment and the several legislative acts passed pursuant thereto, the state tax on public utilities was determined by a percentage of their gross earnings; that on insurance companies by a percentage of their gross premiums; that on banks (national and state) by a percentage of their capital, surplus and undivided profits; and that on other corporations by a percentage of the "actual cash value" of their franchises. This system of taxation was not seriously challenged until the year 1927, when a crisis in bank taxation became acute. The reason for this difficulty is traceable to the fact that national banks, as instrumentalities of the federal government, are taxable by the states only with the authority of Congress, and within the limits prescribed by that body. Until 1864 no provision was made for state taxation of national banks. In 1868 Congress enacted, and has amended from time to time, section 5219 of the Revised Statutes, setting out the methods by which national banks may be taxed, and the limitations within which the local taxing bodies may act. When California adopted its 1910 method of taxing banks, utilities and other corporations, section 5219 permitted, as reflected in our law as it then read, only one form of levy on national banks, viz., a tax on shares. The right to levy such tax was subject to two conditions, namely, (1) the rate

could not be higher than that assessed in the state levying the tax upon other moneyed capital in the hands of individual citizens; and (2) the tax was to be in lieu of all other state, county or municipal charges except taxes on real property. This single authorized method of levy on national banks led to the growth of a more or less uniform system of taxation on these institutions throughout the country; that is to say, the combined value of capital, surplus and undivided profits was made the base of the tax, and the local rate was applied.

In time, however, difficulty with this method of taxing national banks arose because of the limitation that the rate of tax on national bank shares should not be in excess of that assessed upon other moneyed capital in competition with banks. The judicial history of section 5219, *supra*, has been written around attempts of the courts to explain the key words, ''other moneyed capital in the hands of individual citizens''. In 1921, the Supreme Court of the United States declared the Virginia tax on national banks invalid because it violated this provision. (*Merchants Nat. Bank* v. *City of Richmond*, 256 U. S. 635 [65 L. Ed. 1135, 41 Sup. Ct. Rep. 619].) This decision was promptly used by national banks throughout the country to test the validity of the various laws under which they were being taxed. The existence of these and other conditions led to the amendment of section 5219, *supra*, in 1923, and again in 1926. Under this latest amendment, and as the section now reads, the states are authorized, subject to certain conditions, to (1) tax the shares of national banks to their owners; or (2) include the dividends therefrom in the taxable income of the owners or holders thereof; or (3) tax the banks on their net income; or (4) tax the banks according to or measured by their net income. The section further provides that in the case of a tax according to or measured by net income, the taxing state may ''include the entire net income received from all sources'', but the rate shall not be higher than the rate assessed upon state banks or other corporations. The states of New York, Massachusetts, Wisconsin, Oregon and Washington were quick to take advantage of the authority given by this amendment of section 5219, *supra*, and state statutes imposing ''franchise'' taxes on national banks and

other financial and business corporations, and measured by or according to their net income were enacted.

Examination of the final (1929) report of the California tax commission (California State Printing Office Publication No. 63725) discloses that that commission, after an extended and careful study of the state taxing situation, concluded that there was immediate and dire need for a change in the method by which banks and corporations were being taxed in this state. As intimated in the report, this conclusion was prompted in part by certain decisions of the United States Supreme Court (*First Nat. Bank* v. *City of Hartford,* 273 U. S. 548 [59 A. L. R. 1, 71 L. Ed. 767, 47 Sup. Ct. Rep. 462]; *State of Minnesota* v. *First. Nat. Bank,* 273 U. S. 561 [71 L. Ed. 774, 47 Sup. Ct. Rep. 468]) interpreting the phrase, "other moneyed capital in the hands of individual citizens", appearing in section 5219, *supra,* and by the decision of this court invalidating the Solvent Credits Acts of 1925 and 1927. (*Arnold* v. *Hopkins,* 203 Cal. 553 [265 Pac. 223].) The report of the commission states, in part: "Under the interpretation of the existing federal statute [sec. 5219] the method of taxing banks now in force in this state can apparently be maintained only at the sacrifice of the special treatment of intangibles, which is greatly desired by the public, and at the cost of the taxation of mortgages. There is no assurance that the Congress will extend further the state's power to tax banks and the commission believes that mortgages should not be taxed. Consequently some new method of taxing banks must be sought." It was estimated that if the crisis caused by the federal decisions and the existing condition of the state taxing system were not met by an immediate constitutional amendment and legislative enactment, the state would be faced with the likely loss of all revenue from banks beginning with the fiscal year July 1, 1926—a loss, if suffered, of approximately $22,000,000. The tax commission thereupon concluded "that the only practicable method of securing a substantial revenue from the banks is to proceed under the fourth method permitted by the federal statute, and tax banks 'according to or measured by net income' ". Under this method, it was stated, "the state may continue to exempt real estate mortgages and may enact a solvent-credits law without danger of invalidating the bank tax". It was

therefore recommended to the Governor that a special session of the legislature be called to consider the submission to the people of an amendment to the state Constitution providing for a tax on banks "according to or measured by their net income". Pursuant to this suggestion, and in response to a call from the Governor, the legislature met in special session on September 4, 1928, and on the following day voted to submit to the people an amendment authorizing this new method for taxing banks and other corporations and providing for the taxation of intangibles. The proposed amendment (sec. 16, art. XIII, Const.) was adopted by popular vote at the general election on November 6, 1928. It provides that "Notwithstanding any other provision of the Constitution", banks, including national banking associations, and all financial, mercantile, manufacturing and business corporations shall annually pay to the state a tax to be measured by or according to their net income, and that the legislature may define net income "to be the entire net income received from all sources".

In conformity with the provisions of this constitutional amendment the legislature at its regular session in 1929, enacted the California Bank and Corporation Franchise Tax Act, *supra*, the validity of which is now brought into question. This statute is the first departure from the general theory that property should be the fundamental test of the adequacy of all business taxation in California. In so far as material here, the act provides, in substance:

Section 1. Every national bank located within this state shall annually pay to the state a tax according to or measured by its net income to be computed at the rate of four per cent upon the basis of its net income for the next preceding fiscal or calendar year;

Section 2. Every bank, other than a national bank doing business within this state, shall annually pay to the state "for the privilege of exercising its corporate franchises within this state", a tax according to or measured by its net income, to be computed at the rate of four per cent upon the income for the next preceding fiscal or calendar year;

Section 4. Every financial, mercantile, manufacturing and business corporation, doing business within this state, shall annually pay to the state, "for the privilege of exercising its corporate franchises within this state", a tax according to

or measured by its net income, to be computed at the rate of four per cent upon its net income for the next preceding fiscal or calendar year;

Section 6. The term "gross income" includes among other things, "all interest received from federal, state, municipal or other bonds".

Section 7. The term "net income" means the gross income less the deductions allowed, no deduction being allowed for interest received from federal, state, municipal or other tax exempt bonds.

As intimated at the commencement of this opinion, it is the appellant's contention that the act is unconstitutional and void in so far as it attempts to include interest from tax-exempt bonds in the tax base. In support thereof, reliance is placed by appellant on section 1¾ of article XIII of the state Constitution exempting from taxation all bonds issued by the state, or any county, city and county, municipal corporation or district thereof, and on section 10 of article I of the federal Constitution and section 16 of article I of the state Constitution forbidding the state to pass any law impairing the obligation of contracts. In short, appellant urges that to permit the state to include interest from tax-exempt bonds in the tax base is to permit it to do indirectly what it cannot do directly. The attorney-general replies that it has been consistently held by the United States Supreme Court that either the federal government or a state government "may legally impose a franchise tax upon corporations for the right to exercise their corporate privileges, measured in amount by a percentage of net income although a portion of the income is derived from property which in itself is nontaxable, the court stating that the distinction lies between the attempt to tax the property as such and to measure a legitimate tax upon the privileges involved in the use of such property".

■ It is settled, of course, that in granting a franchise to a corporation the state may limit the powers to be exercised under it, annex conditions to its enjoyment, and require the corporation to contribute to the revenues of the state. (*Home Ins. Co.* v. *New York*, 134 U. S. 594 [33 L. Ed. 1025, 10 Sup. Ct. Rep. 593].) ■ A franchise tax is a tax-imposed upon a corporation for the right or privilege of being a corporation or of doing business in a corporate

capacity, and differs materially from property taxes as levied for state and municipal purposes in the basis prescribed for computing the amount of the tax. The doctrine of the taxability of corporate franchises, without reference to the character of the property in which their capital stock or their deposits are invested, has long since been established. (*Society for Savings* v. *Coite*, 73 U. S. (6 Wall.) 594 [18 L. Ed. 897]; *Providence Inst.* v. *Massachusetts*, 73 U. S. (6 Wall.) 611 [18 L. Ed. 907].) Accordingly, it was early held that ''where a tax is lawfully imposed upon the exercise of privileges within the taxing power of the state or nation, the measure of such tax may be the income from the property of the corporation, although a part of such income is derived from property in itself nontaxable''. (*Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 163 [Ann. Cas. 1912B, 1312, 55 L. Ed. 389, 31 Sup. Ct. Rep. 342].) The cited case is principally relied on by the attorney-general as establishing the constitutionality of the act here under consideration. This doctrine, that the taxing power may with propriety include within a franchise tax base the interest received from tax-exempt bonds, while never expressly overruled, seemed to have been greatly narrowed and restricted in its application by the decision in *Macallen* v. *Massachusetts*, 279 U. S. 620 [73 L. Ed. 874, 49 Sup. Ct. Rep. 432, 437], decided by a divided court on May 27, 1929; but it must be noted that, in deciding in that case that the Massachusetts Franchise Tax Act was unconstitutional, in so far as it purported to include in the tax base interest from tax-exempt securities, the Supreme Court did not see fit to overrule its decision in *Flint* v. *Stone Tracy Co.*, *supra*, and the dissenting minority of the court, per Mr. Justice Stone, said: ''There is no constitutional principle and no decision of this court, of which I am aware, which would deny to the state the power so to tax the privileges which it has conferred upon petitioner, even though all its property were tax-exempt securities of the United States and income derived from them. For seventy years this court has consistently adhered to the principle that either the federal or state governments may constitutionally impose an excise tax on corporations for the privilege of doing business in corporate form, and measure the tax by the property or net income of the corporation, including the tax-exempt secu-

rities of the other or income derived from them. (*Provident Institution* v. *Massachusetts*, [6 Wall. 611, 18 L. Ed. 907] *supra; Society for Savings* v. *Coite*, 6 Wall. 594 [18 L. Ed. 897] ; *Hamilton Co.* v. *Massachusetts*, [6 Wall. 632, 18 L. Ed. 904] *supra; Home Ins. Co.* v. *New York*, 134 U. S. 594 [33 L. Ed. 1025, 10 Sup. Ct. Rep. 593] ; *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 162, 165 [Ann. Cas. 1912B, 1312, 55 L. Ed. 389, 31 Sup. Ct. Rep. 342].) In *Flint* v. *Stone Tracy Co.*, a federal tax on corporations 'with respect to carrying on or doing business' measured by net income, was held to be an excise, not a direct tax on property or income, and so was valid, although not apportioned under art. I, sec. 2, cl. 3, sec. 9, cl. 4 of the Constitution and notwithstanding the fact that net income from tax-exempt municipal bonds was included in the measure of the tax. In no technical sense does this tax seem open to objection. Being an excise the tax is not one on property or income and may include either in its measurement although not directly taxable.''

If the Macallen case raised any doubt, the question seems to be now definitely settled. When this case now before us was submitted, there was pending in the United States Supreme Court a case, *Educational Films Corp. of America* v. *Ward, Atty. General of New York et al.*, 282 U. S. 379 [75 L. Ed. 400, 51 Sup. Ct. Rep. 170], which was an action to restrain the collection of a tax levied under the New York tax law which lays an annual tax on every domestic corporation of certain classes "for the privilege of exercising its franchise in [that] state in a corporate or organized capacity''. The tax, payable in advance for each year, is at the rate of four and one-half per cent of so much of the corporation's "entire net income'' for the preceding fiscal year as is allocated to the business carried on within the state. Such "net income'' embraces "income from any source'', and "is presumably the same as the entire net income which such corporation is required to report to the United States, plus any income received as dividends on stocks or any interest received'' from federal, state, municipal or other bonds. Subdivision 3 of section 208 of the act provides: "The term 'entire net income' means the total net income, including all dividends received on stocks and all interest received from federal, state, municipal or other bonds. . . . '' The Films Corporation was the owner of certain copyrights

granted by the United States upon motion picture films, and had received royalties from the licensing of them. It challenged the tax assessed against it under the New York statute, *supra,* so far as it was measured by the amount of these royalties, because it was to that extent, it claimed, a tax on federal instrumentalities. The tax was upheld. In the course of the opinion the court says: "The precise question now presented was definitely answered in *Flint* v. *Stone Tracy Co.,* 220 U. S. 107, 162 et seq. [Ann. Cas. 1912B, 1312, 55 L. Ed. 389, 31 Sup. Ct. Rep. 342], which upheld a federal tax, levied upon a corporate franchise granted by a state, but measured by the entire corporate income, including, in that case, income from tax-exempt municipal bonds. In reaching this conclusion, the court reaffirmed the distinction, repeatedly made in the earlier decisions, between a tax, invalid because laid directly on governmental instrumentalities or income derived from them, and an excise which is valid because imposed on corporate franchises, even though the corporate property or income which is the measure of the tax embraces tax-exempt securities or their income. See *Society for Savings* v. *Coite,* 6 Wall. 594 [18 L. Ed. 897]; *Provident Institution* v. *Massachusetts,* 6 Wall. 611 [18 L. Ed. 907]; *Hamilton Co.* v. *Massachusetts,* 6 Wall. 632 [18 L. Ed. 904]; *Home Insurance Co.* v. *New York,* [134 U. S. 594] *supra."*

After citing and commenting upon many of its own decisions in which the same or similar questions had been considered, the court continues: "Having in mind the end sought, we cannot say that the rule applied by this court for some seventy years, that a non-discriminatory tax upon corporate franchises is valid, notwithstanding the inclusion of tax-exempt property or income in the measure of it, has failed of its purpose, or has worked so badly as to require a departure from it now; or that the present tax, viewed in the light of actualities, imposes any such real or direct burden on the federal government as to call for the application of a different rule.

"The decision of this court in *Macallen Co.* v. *Massachusetts, supra,* upon which appellant relies, was not such a departure. That case did not overrule *Flint* v. *Stone Tracy Co., supra.* Instead, the opinion rested the decision on the distinguishing fact that the tax-exempt securities were in-

cluded in the measure of the franchise tax by virtue of an amendment to the taxing statute which, it was held, was specifically intended to reach the income from tax-exempt national and municipal bonds which had previously not been included in the measure of the tax.''

■ In adopting the constitutional amendment, *supra*, providing that all banks, including national banking associations, and all financial, mercantile, manufacturing and business corporations shall annually pay to the state a tax to be measured by or according to their net income, and that the legislature may define net income ''to be the entire net income received from all sources'', the people of California were but following the recommendation of their tax commissioners, *supra*, and the Governor (advance message to the legislature, August 16, 1928), that they accept the permission granted by the Congress of the United States to tax national banks ''according to or measured by net income''. (Sec. 5219, U. S. Rev. Stats., *supra*.) The rate of taxation fixed by the legislature is not higher than the rate assessed upon state banks or other corporations. The tax is not a property tax. The state Constitution authorizes the scheme of taxation, and, under the decisions of the United States Supreme Court, the federal Constitution interposes no barrier to its operation. As said by the final authority on the question: ''A tax very well may be upheld against any casual effect it may have upon the bonds of the United States when passed with a different intent and not aimed at them.'' (*Miller* v. *Milwaukee*, 272 U. S. 713 [71 L. Ed. 487, 47 Sup. Ct. Rep. 280] ; *Macallen Co.* v. *Massachusetts, supra*, p. 831; *Educational Films Co.* v. *Ward, supra.*)

■ Appellant's further contention, that the profits received by it from the purchase and sale of such nontaxable securities are also constitutionally exempt from taxation by the state, is without merit. In the very recent case of *Willcutts* v. *Bunn*, 282 U. S. 216 [75 L. Ed. 304, 51 Sup. Ct. Rep. 125]), the United States Supreme Court determined that the federal government, under the provisions of the income tax act, might properly tax the profits realized on the sale of nontaxable state securities. The opinion declares, in substance, that in the case of tax-exempt securities, the subject held to be exempt from taxation is the principal and interest of the securities,

but that it does not follow that because a tax on the interest is a tax on the securities themselves and therefore forbidden, a nondiscriminatory excise tax cannot be imposed upon the profits derived from the purchase or sale of such securities. The opinion states: "The sale of the bonds by their owners, after they have been issued . . . is a transaction distinct from the contracts made by the government in the bonds themselves, and the profits on such sales are in a different category of income from that of the interest payable on the bonds." In view of this holding, we find no constitutional objection to the inclusion in the tax base of the profits received by appellant from the purchase and sale of the securities involved.

The judgment is affirmed.

Richards, J., Shenk, J., Curtis, J., Preston, J., and Seawell, J., concurred.

LANGDON, J., Dissenting.—I dissent.

In my opinion, this cause falls squarely within the holding in the case of *Macallen Co.* v. *Massachussets*, 279 U. S. 620 [73 L. Ed. 874, 49 Sup. Ct. Rep. 432]. The decision in the Macallen case recognizes the doctrine of the earlier case of *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 163 [Ann. Cas. 1912B, 1312, 55 L. Ed. 389, 31 Sup. Ct. Rep. 342], to the effect that the taxing power may with propriety include within a franchise tax base the interest received from tax-exempt bonds, but declares that a tax upon the privilege of doing business measured in part by the amount of non-taxable interest received "may, nevertheless, be adjudged to lay a tax upon the interest, if that purpose be fairly inferable from a consideration of the history, the surrounding circumstances, or the statute itself considered in all its parts". Thus, a legislature may not by the artful use of words deprive the courts of their authority to look beyond the words to the real legislative purpose. It is for the courts to determine whether what is in form declared to be an excise tax is such a tax or, under the guise of such designation, is in substance and reality a tax on the income derived from tax-exempt property. In *Miller* v. *Milwaukee*, 272 U. S. 713 [71 L. Ed. 487, 47 Sup. Ct. Rep. 280], it is held: "If the avowed purpose or self-evident operation of

a statute is to follow the bonds of the United States and to make up for its inability to reach them directly by indirectly achieving the same result, the statute must fail even if but for its purpose or special operation it would be perfectly good. . . . A tax very well may be upheld as against any casual effect it may have upon the bonds of the United States when passed with a different intent and not aimed at them, but it becomes a more serious attack upon their immunity when they are its obvious aim.''

After a careful examination of the Massachusetts tax commission's report, which report undoubtedly led to the adoption of the act there attacked, and following a critical study of the act itself, the United States Supreme Court in the Macallen case, *supra*, declared the Massachusetts Franchise Tax Act to be in violation of the congressional mandate exempting federal bonds and securities from taxation, and in violation of the contract clause of the Constitution, in so far as it purported to include in the tax base, interest from tax-exempt securities. While the tax in that case was designated as a "franchise tax", the court concluded from the history and circumstances surrounding its enactment that it was plainly the intention of the Massachusetts legislature to include the interest from tax-exempt securities within the tax base in order that such nontaxable securities, held in large quantities by banks and other financial corporations, might, indirectly at least, be made to bear their proportionate share of the tax burden. In other words, it was held that the act in substance and effect imposed a tax upon the exempt securities themselves in violation of the constitutional inhibition—the burden falling upon them by their use as a measure not being casual and incidental.

If, therefore, it be reasonably ascertainable that interest from tax-exempt property is included within the tax base of a franchise tax measured by net income for the purpose of reaching such nontaxable property or the income therefrom, the tax, at least in this particular, is unconstitutional and void. In so deciding the Macallen case the court did not find it necessary to overrule *Flint* v. *Stone Tracy Co.*, *supra*, though the actual objective operation of the tax upheld in the Flint case and that condemned in the Macallen case is identical. There can be no question, therefore, but that the court in the Macallen case held the tax void solely

for the reason that it was enacted with the purpose of reaching nontaxable property.

Application of that test satisfies me that the California Bank and Franchise Tax Act, *supra*, must fall with the Massachusetts statute in so far as it attempts to include interest from tax-exempt property in the tax base. For all practical purposes the two acts are substantially the same. Each designates the tax therein imposed as a "franchise tax", as distinguished from a property tax, but, as we have already seen, there is no magic in those words. It is our duty to look beyond the mere form of the statute and determine what, in truth and in substance, is its purpose and effect. True, as pointed out by the attorney-general, the Massachusetts attempt to include interest from tax-exempt securities within the tax base was the result of a deliberate amendment of its taxing statute to this effect whereas our statute, as originally enacted, included such interest in the tax base. To conclude that this fact alone warrants a distinction between the two cases is to hold that Massachusetts cannot take in two bites what California can have in one. Our investigation discloses that substantially the same reasons prompted the enactment of the California statute that resulted in the adoption of the Massachusetts law. The special and final reports of the California tax commission, which undoubtedly were before the legislature when it enacted the tax law corresponding to the Massachusetts tax statute, contained in substance the same observations on the possibility of reaching exempt securities as did that before the Massachusetts legislature which is quoted by the Supreme Court in the Macallen case as showing an intention to tax them by indirection. Both reports of the local taxing commission state: "As has been pointed out, the 1926 amendment to section 5219 [authorizing the taxing of national banks 'according to or measured by net income'] was drafted with the avowed object of permitting the inclusion in the tax base of such income as the interest from tax-exempt bonds. In the case of corporations other than banks, the point is not of vital importance. But the banks hold such large quantities of these tax-exempt bonds that the effect of a decision holding that the state may not include them in the base would be very serious indeed. An analysis of the replies of the banks to the commissioner's question-

naire indicates that the noninclusion of federal bond interest would reduce that base by more than one half.'' With this information before it, the commission suggested to the Governor and to the legislature the inclusion of tax-exempt interest in the tax base, arguing that otherwise ''no substantial tax would be forthcoming from the banks''. The commission appreciated the fact that the validity of the plan it was recommending had not, at that time, been judicially determined, for in its report it recognized that ''a suit [the Macallen case] has already been filed in Massachussets questioning the right of a state to include such interest''. The commission's report also makes reference to the fact that New York and Massachusetts had already enacted tax statutes similar to the one proposed, thus evidencing an intention to pattern the California act after the Massachusetts statute, which has now been declared unconstitutional in the Macallen case. Then again, at the public hearing on the proposed tax measure held on January 17, 1929, before the senate and assembly sitting in committee of the whole, Professor R. M. Haig of Columbia University, who had served as technical advisor to the tax commission, while referring to the proposed tax as a ''franchise tax'' imposed for the privilege of doing business as a corporation, informed the legislature that ''Interest from tax-exempt bonds is an exceedingly important item in a tax which is applied to banks''. (State Printing Office Publication No. 64915.) As further indicating the intent with which the California statute was proposed, and pointing out some of the difficulties confronted by the proposed act, Professor Haig, writing in the bulletin of the National Tax Association, volume XIV, pages 231, 236, under date of May, 1929, states: ''The proposal of the board of supervisors of San Francisco [to exclude from the tax base the interest on nontaxable securities] carried a threat of complete disaster. The exclusion of tax-exempt interest from the base was of importance only in the case of banks, who were the only large holders of government bonds. For them it meant practically complete exemption. Several of the largest and most prosperous banks in the state . . . would pay no franchise tax whatsoever. The banks themselves did not want this exemption and it was they who produced evidence which on the very day of the vote on the bill convinced the San Francisco

officials that its passage would not unfavorably affect the flotation of the municipal issues. Had their proposal [to exclude tax-exempt interest] prevailed the new tax would have been completely wrecked.''

I am of the view that both the form and effect of the Massachusetts and California statutes are substantially identical so far as concerns the qualities that led the Supreme Court of the United States to hold the former tax void. I am also satisfied that in enacting the California Bank and Corporation Franchise Tax Act, *supra*, it was the legislative intention and purpose to reach nontaxable securities by including in the tax base interest received thereon. Under the holdings in *Miller* v. *Milwaukee, supra*, and the Macallen case, *supra*, this feature strikes at the validity of the act. It is no sufficient answer to state that the act was an emergency measure, enacted to avert a crisis which threatened the revenues of the state, or that it was intended to give to the state a modernized system of bank and corporate taxation, for in declaring the Massachusetts statute invalid as an attempt to reach nontaxable securities, the federal Supreme Court did not find that the legislature might not have other and legitimate motives as well. There can be no doubt but that the California tax commission suggested and the legislature adopted an act including interest from tax-exempt securities in the tax base, because both were convinced that banks and other corporations held such large quantities of these nontaxable securities as to require such a tax base in order to receive a ''substantial tax'' from such entities. The tax was aimed directly at the nontaxable securities and the interest received therefrom. In line with the decision of the Supreme Court of the United States in the Macallen case I must, therefore, conclude that in so far as the Bank and Corporation Franchise Tax Act, of this state, attempts to include interest from federal, state, municipal or other tax-exempt bonds in the tax base upon which the taxes of state banks and corporations are computed, the act in substance and effect imposes a tax upon such tax-exempt securities and is invalid and void. As to the federal bonds and securities, the act is in derogation of the constitutional power of Congress to borrow money on the credit of the United States, as well as in violation of the acts of Congress declaring such bonds and securities to be nontaxable. Applying

the test set up by the federal court, the same considerations that govern in the case of federal securities determine the impropriety of including the income from state, county, city and county, municipal or district bonds under the tax base measurement plan adopted in the act. If such income is included, the act impairs the obligation of the contract created by section 1¾ of article XIII of the state Constitution, which provides that such bonds and securities "shall be free and exempt from taxation". That surely must be so as to bonds and securities issued before November 6, 1928, the date on which section 16 of article XIII of the Constitution was adopted.

The decision in the case of *Educational Films Co.* v. *Ward,* 282 U. S. 379 [75 L. Ed. 400, 51 Sup. Ct. Rep. 170], cited in the majority opinion, does not overrule the Macallen case but, on the contrary, is distinguishable therefrom and follows closely the earlier decisions of the United States Supreme Court. It recognizes, as does the Macallen case, that the courts must look beyond the mere form and language of a taxing statute and determine its operative effect; that is to say, the legislative characterization of a taxing statute as a "franchise" tax act is not binding on the courts if it appears that the act in substance and effect imposes an *ad valorem* or property tax. It also recognizes that the doctrine announced in *Flint* v. *Stone Tracy Co.* is not overruled by the holding in the Macallen case and that under the former, a state may well include within the measure of a "franchise" tax, the interest or income from tax-exempt property, but that, under the holding in the latter case [the Macallen case] this is so *only* when such inclusion is merely "casual and incidental" and not the result of an attempt to tax indirectly what cannot be reached directly. In other words, the decision in the Educational Films Co. case, so strongly relied on in the majority opinion, merely recognizes the two lines of cases represented by *Flint* v. *Stone Tracy Co.* and *Macallen* v. *Massachusetts* and then concludes that the New York statute involved in the Educational Films Co. case includes the income from *copyrights* only as an *incident* to the imposition of a proper franchise tax upon net income and therefore falls within the category of statutes upheld in the Flint case. In distinguishing the New York act from the Massachusetts act declared unconsti-

tutional in the Macallen case, the court in the Educational Films Co. case declares: "But the statute, before these amendments, was sufficiently broad to include income from copyrights within the measure of the tax; and neither before nor after the amendments did it *make any mention of copyrights or their income.* There is nothing to suggest that the legislature could at any time have had in mind the addition of income from copyrights to the measure of the tax, or that the statute or the amendments were adopted 'for the very purpose of subjecting' it *'pro tanto* to the burden of the tax', which was declared to be the vice of the statute in *Macallen Co.* v. *Massachusetts, supra,* p. 631. That the royalties play some part in the measure of the tax is the result of the application of the general language of the statute to particular circumstances to which the statute makes no specific reference. In this respect, the present statute differs in no substantial way, from that upheld in *Flint* v. *Stone Tracy Co., supra."* (The statute in *Flint* v. *Stone Tracy Co., supra,* made no specific reference to tax-exempt property, such property being only incidentally included in the tax base by reason of the general language of the act referring to income from "all sources".)

From the foregoing quotation, taken from the Educational Films Co. case, it is quite clear that the New York statute there upheld made no specific reference to the income from nontaxable copyrights *but such income was included within the tax base solely by reason of the general language of the act requiring the inclusion of "income from any source".* (Section 209 of the New York act.) In other words, the inclusion of income from nontaxable copyrights in the New York tax base was only "casual and incidental" to the imposition of the tax and not the result of any discoverable intent or purpose to include such income in order to reach the nontaxable subject itself.

Our statute, on the other hand, as already pointed out, makes specific reference to and requires the inclusion of tax-exempt interest from nontaxable bonds in the tax base, thus evidencing an intent and purpose, discoverable upon the face of the statute, to include such interest in the tax base as a means of requiring holders of tax-exempt securities to bear their proportionate share of the tax burden. Then, as further pointed out, this express purpose and intent of the

legislature is clearly evidenced by the report to the legislature of the California tax commission, which report, under the holding in the Macallen case, may properly be referred to as showing the legislative intent, and also by the quotation of statements made before the senate and assembly when sitting as a committee of the whole, and considering the enactment of the California Bank and Corporation Franchise Tax Act.

That provision of the New York statute, quoted in the majority opinion herein, which calls for the inclusion of interest from municipal and other nontaxable bonds within the tax base, though substantially the same as our act in this particular, was not before and was not considered by the United States Supreme Court in the Educational Films Co. case. That case and the decision therein were concerned solely with the inclusion in the tax base of the income from copyrights, which income was only casually and incidentally included therein by reason of the general language of the act requiring the inclusion of income from ''any source''. However, as already indicated, it is apparent, both upon the face of the California statute and from the legislative history thereof, that the inclusion of the interest from tax-exempt bonds was not ''casual and incidental'' but deliberate, the intent being to tax indirectly what could not be reached directly.

In conclusion, therefore, it may be said that the holding in the Educational Films Co. case is entirely consistent with the earlier decisions of the United States Supreme Court, but the statute there involved, so far as it concerned itself with the income from tax-exempt copyrights, the only question then before the court, properly fell within the doctrine set down in *Flint* v. *Stone Tracy Co.*, whereas the California act, so far as the interest from nontaxable securities is involved, falls clearly within the category of statutes condemned in the Macallen case and is therefore unconstitutional in this respect.