[Civ. No. 12631. First Dist., Div. One. Feb. 16, 1945.]

SOUTHERN PACIFIC COMPANY (a Corporation), Appellant, v. CHARLES J. McCOLGAN, as Franchise Tax Commissioner, etc., Respondent.

C. W. Durbrow and Harry H. McElroy for Appellant.

Robert W. Kenny, Attorney General, Hartwell H. Linney, Chief Assistant Attorney General, and Adrian A. Kragen, John L. Nourse and James E. Sabine, Deputies Attorney General, for Respondent.

PETERS, P. J.—Plaintiff, Southern Pacific Company, appeals from a judgment denying it a refund of taxes assessed against it for the taxable year 1935 under the Bank and Corporation Franchise Tax Act. (Stats. 1929, p. 19, as amended; Deering's Gen. Laws, 1931, Act 8488, p. 4763; 1933 Supp., p. 2329; 1935 Supp., p. 1929.)

Under the act, taxes for the year 1935 are computed on 1934 income. (§ 4.) In making its tax return plaintiff showed no net income for the year 1934, but a net loss of $7,359,133.03. Accordingly, plaintiff paid the minimum flat tax of $25. Thereafter, the defendant Franchise Tax Commissioner assessed an additional tax against plaintiff on the ground that in its return it had omitted taxable net income from intangibles in the amount of $10,431,539.96. Deducting from this amount the figure for net loss as recomputed at $8,415,717.05, left net income of $2,015,822.91. The tax due on this sum is $80,632.92, of which plaintiff had paid $25, leaving a balance of $80,607.92. Plaintiff paid this sum under protest, plus interest, a total of $99,550.78. After the filing of this action, by reason of recomputations not here material, plaintiff's liability for the tax here involved was reduced, and the larger part of the sum of $99,550.78 paid by plaintiff under protest was refunded. Plaintiff therefore seeks recovery in the present action of only the unrefunded portion of the sum paid under protest, that is, of $6,901.56 plus interest.

The figure of $10,431,539.96 represents the net income from dividends paid to plaintiff by other corporations in which plaintiff owns stock, subject to the deduction provided for in section 8(h) of the statute. It is the contention of the com-

missioner that, under the statute, and subject only to the deduction provided in section 8(h), there must be included in the measure of the tax of this taxpayer all net income from intangibles. Section 8(h) provides that income from dividends shall be deductible to the extent that the dividends are paid by the corporation declaring them from income arising out of business done by it within this state. Plaintiff contends that to include this dividend income of $10,431,539.96 in computing the assessment against it is to tax property and business outside California in violation of the Fourteenth Amendment to the federal Constitution.

Plaintiff was incorporated in Kentucky, but engages in no business there, and under its charter has no legal right to engage in the railway business there. It operates a railroad transportation business in California and six other western states. The unitary transportation business, not including income from intangibles, was operated at a loss in 1934. In determining what percentage of the gains and losses of this business should be allocated to California as attributable to business done here, application of the allocation formula directed by the commissioner resulted in a figure of 56.11046 per cent. The loss figure of $8,415,717.05, referred to above, is 56.11046 per cent of the net loss from plaintiff's unitary railroad transportation business as operated in the seven western states.

Plaintiff contends that no part of the dividend income included in the tax as revised by the commissioner is income from business done in California, or from property having a situs for taxation in California, and hence to include it in the measure of the tax is to tax business and property outside the jurisdiction of this state. Plaintiff further contends, in the alternative, that if this dividend income may be taken into consideration at all, the act requires that the same allocation percentage should be applied to it as to plaintiff's railroad operating income, that is, that only 56.11046 per cent of plaintiff's net dividend income, or $5,853,185.06 may be allocated to California. This amount would be more than offset by plaintiff's net loss of $8,415,717.05, with the result that no additional tax would be due California for the taxable year in question.

Plaintiff's theory is that the stocks which gave rise to the dividends do not have a situs for tax purposes in California;

that under the principle of *mobilia sequuntur personam* intangibles have a situs at the legal domicile of the corporation, that is the state of its incorporation, unless they have acquired a business situs by reason of being used in a business conducted elsewhere. In the case herein, Kentucky is the legal domicile of plaintiff and, so plaintiff contends, the stocks have acquired a business situs in New York "by reason of dominant control and use" there. The by-laws of plaintiff corporation provide that the general management of the company shall be vested in a board of directors and in an executive committee, and that both groups, unless otherwise ordered, shall hold their meetings in New York. It is an admitted fact that during all periods here pertinent, both groups have in fact met in New York.

The theory of the commissioner, sustained by the trial court, is that the statute purports to tax this income and that California constitutionally may include in the measure of the tax all dividend income of plaintiff because the facts show that the city of San Francisco is the commercial domicile of plaintiff. It is urged that under recent decisions of the United States Supreme Court the state of the commercial domicile may tax all income from intangibles. Plaintiff challenges the view that California is its commercial domicile as regards its stockholding activities, which, in plaintiff's analysis, are no part of its unitary railroad business. That is, plaintiff contends that its stockholding activities constitute a separate enterprise from its unitary railroad business, and that New York is its commercial domicile as regards those activities. The concepts of business situs and commercial domicile will be examined more fully hereafter.

It is stipulated that for the years 1934 and 1935 neither Kentucky nor New York, nor any other state, collected or levied a property tax on the intangibles the income from which is involved in this action, nor did either state collect or levy any tax directly or indirectly measured by the income from these stocks. The result is that unless the right of California to include this large amount of dividend income in the measure of its tax is sustained, such income will be free from state taxation.

Plaintiff contends that it is immaterial whether some other state has taxed these stocks or the income they yielded to it. We disagree. We shall hereafter refer to decisions of the

Supreme Court of the United States which hold that at least in certain circumstances there is no constitutional objection to double taxation of intangibles, and that more than one state may have jurisdiction to tax them. But nevertheless a state may declare, in its tax statutes, that it is opposed to the policy of that state to impose double taxation. That is a matter for each state to decide for itself. The Bank and Corporation Franchise Tax Act contains such a provision in section 10 as regards the commissioner's duty to allocate income from business done partly within and partly without the state. If upon the facts of a particular case California has jurisdiction to tax and another state also may tax the same interest and has done so, there would be a problem as to whether the California statute contains a general provision against double taxation of dividend income, and if so, as to which state had the better right to tax. Here our problem is not thus complicated. No other state has collected or levied a tax in respect to the stocks here involved or dividends therefrom. The question is whether California legally can impose, and by statute has imposed, the tax paid by plaintiff under protest.

Plaintiff's argument that in any event the act requires the commissioner to allocate only 56.11046 per cent of its dividend income to California may be rejected first.

In this connection plaintiff relies upon the allocation provision of section 10, which refers to all income from business done. Plaintiff contends that this provision applies to its dividend income, and that unless its dividend income is income from business done, in which event it is subject to the allocation provision, it cannot be included in the measure of the tax at all. That is, plaintiff contends that dividend income is either subject to allocation by the terms of the act, or under its provisions not to be included in the measure of the tax at all.

Section 10 as it read in 1935 provided: "If the entire business of the bank or corporation is done within this State, the tax shall be according to or measured by its entire net income; and if the entire business of such bank or corporation is not done within this State, the tax shall be according to or measured by that portion thereof which is derived from business done within this State. The portion of net income derived from business done within this State, shall be determined by an allocation upon the basis of sales, purchases, expenses of manufacture, pay roll, value and situs of tangible property,

or by reference to these or other factors, or by such other method of allocation as is fairly calculated to assign to the State the portion of net income reasonably attributable to the business done within this State and to avoid subjecting the taxpayer to double taxation.'' (Stats. 1935, chap. 275, p. 965.)

For a time section 10 contained the following provision: ''Income from intangible personal property which is not deductible under the provisions of subsection (h) of section 8 hereof shall be subject to allocation.'' This provision was added to section 10 in 1931, two years after adoption of the Bank and Corporation Franchise Tax Act. (Stats. 1931, chap. 1066, p. 2226.) It was omitted from the section as amended in 1935. (Stats. 1935, chap. 275, p. 965.) Plaintiff concedes that the statute as amended in 1935 governs its tax liability. The same legislative chapter which amended section 10 by omitting the express provision for allocation of income from intangibles, made railroad corporations subject to the Bank and Corporation Franchise Tax Act for the first time. (Stats. 1935, chap. 275, p. 960, § 4(3); chap. 353, p. 1246.) The amendments became effective in June, 1935. Section 4(8) provided: ''The provisions of this subdivision and of all other amendments to this act enacted during the year 1935, shall apply to taxable years beginning after December 31, 1934.'' The tax here involved is for the taxable year beginning January 1, 1935, although measured by income for the year 1934.

If the provision for allocation of income from intangibles remained in the section it would be necessary to determine whether the allocation fraction applied to plaintiff's railroad operating income should be used in allocating its dividend income, or whether such income should be considered separately. (See *Fargo* v. *Hart,* 193 U.S. 490 [24 S.Ct. 498, 48 L.Ed. 761]; Ballantine, California Corporation Laws (1932), p. 762, § 581; 17 Cal.L.Rev. 512.) A formula which would be equitable as to railroad operating income might not be appropriate to dividend income, which, in a particular case, might be attributable all to California, all to another state, or in part to California, but on a different basis from railroad operating income. But in our view it is unnecessary to consider these matters further in view of the omission of the allocation provision in section 10 as amended in 1935.

The presumption is, of course, that the Legislature by

deleting the express provision for allocation of income from intangibles intended a substantial change in the law. (See 23 Cal.Jur. § 154, p. 778; 10 Cal.Jur. 10-Yr.Supp. § 154, p. 407.) ▇▇▇ But plaintiff contends that the effect of the amendment was merely to eliminate a surplus provision, and that dividend income is income from *business done,* as to which section 10, after, as well as before, the 1935 amendment, provides for allocation, without need for a special provision. The answer to this contention is that the dividend income here involved is not income from "business done" within the meaning of the Bank and Corporation Franchise Tax Act. In *Union Oil Associates* v. *Johnson,* 2 Cal.2d 727 [43 P.2d 291], the court held that a holding company which engaged in no other activities was not doing business within the Bank and Corporation Franchise Tax Act, which imposed a tax on corporations of certain classes "doing business within the limits of this State." This decision was in line with a long list of cases interpreting federal revenue acts. (*Flint* v. *Stone Tracy Co.,* 220 U.S. 107 [31 S.Ct. 342, 55 L.Ed. 389]; *Zonne* v. *Minneapolis Syndicate,* 220 U.S. 187 [31 S.Ct. 361, 55 L.Ed. 428]; *McCoach* v. *Minehill & S. H. Railway Co.,* 228 U.S. 295 [33 S.Ct. 419, 57 L.Ed. 842]; *United States* v. *Emery etc. Co.,* 237 U.S. 28 [35 S.Ct. 499, 59 L.Ed. 825]; *Von Baumbach* v. *Sargent Land Co.,* 242 U.S. 503 [37 S.Ct. 201, 61 L.Ed. 460]; *Edwards* v. *Chile Copper Co.,* 270 U.S. 452 [46 S.Ct. 345, 70 L.Ed. 678]; *Rose* v. *Nunnally Inv. Co.,* 22 F.2d 102; *Eaton* v. *Phoenix Securities Co.,* 22 F.2d 497.) Those acts imposed a tax measured by the value of their capital stock on corporations doing business.

If a holding company which engages in no other activities is not a corporation doing business, it follows that its receipt of dividend income does not constitute "doing business" within the meaning of the act, and that dividend income is not as to the holding company to which it is paid income from business done. If a corporation engages in other activities, but also acts as a holding company, its holding company activities do not constitute doing business, nor are dividends paid to it income from business done. The concept that the activities of a holding company do not constitute a doing of business, but, rather, the receipt of the fruits of ownership of property, with activities incidental thereto, is a well established one, not to be re-examined at this date in interpreting our statute,

which has been construed as perpetuating it. (*Union Oil Associates* v. *Johnson, supra.*) Indeed, in 1933 the act was amended to provide expressly that a holding company should not be considered "a financial, mercantile, manufacturing or business corporation or a corporation doing business in this State for the purposes of this act." (Stats. 1933, chap. 303, p. 871, § 4.)

It is true that recent federal cases indicate a tendency to find that holding companies have engaged in other activities in addition to functioning as a holding company, by reason of which other activities they are subject to the federal tax imposed on the capital stock of corporations doing business. (*Argonaut Consolidated Mining Co.* v. *Anderson*, 52 F.2d 55; *Associated Furniture Corp.* v. *United States*, 44 F.2d 78; *Barker Bros. Corp.* v. *Rogan*, 126 F.2d 917.) But these decisions do not overthrow the tenet that when a corporation's relation to other corporations in which it owns stock is that of a holding company only, such activity is not doing business, and it follows that its dividend income is not income from business done. Hence, since the omission of the express provision for allocation of income from intangible personal property there is no authorization in the act for allocation of the dividend income of a holding company. It was stipulated that plaintiff did not engage in trading in the stocks here involved, nor in any activity with respect thereto, other than the receipt and disbursement of dividends.

■ Plaintiff next contends that unless dividend income is income from business done, the act does not include it in the measure of the tax at all. There is no such limitation in the act. Apparently it is the thought of plaintiff that the tax imposed is so limited by section 10 that the only tax imposed is on "business done" income. While it is true that the statute imposes a tax measured by net income only on corporations doing business in this state, there is no provision that only income from business done shall be included in the measure of the tax to be paid by such corporations. Quite to the contrary, the tax imposed on a corporation subject thereto is "according to or measured by its net income, to be computed, in the manner hereinafter provided, at the rate of four per centum upon the basis of its net income for the next preceding fiscal or calendar year." (§ 4(3).) The tax measure is not restricted by this section to income from business done.

Furthermore, since its enactment in 1929 the act has provided expressly that gross income includes *"all* dividends received on stocks'' except as otherwise provided in the act. (§ 6. Italics added.)   The only provision otherwise providing is section 8(h), to which reference has been made heretofore. An analogy may be found in the federal revenue acts mentioned above.   If a corporation functions as a holding company only, it is not subject to the tax measured by the value of its own capital stock, but if it engages in other activities which constitute a doing of business, the capital stock tax is charged against the full value of its capital stock, not merely against such proportion as reflects the value of property used in activities which constitute doing business.

With the exception contained in section 8(h), the act purports to include in the measure of the tax all net dividend income of corporations doing business in this state, whether the corporation is foreign or domestic, and without regard to whether the securities from which the income is derived have a business situs here, or whether the corporation, if a foreign one, has its commercial domicile here.   But, of course, the statute is effective only to the extent that the state constitutionally can include such dividends in the measure of the tax. (*People ex rel. Alpha Portland Cement Co.* v. *Knapp,* 230 N.Y. 48 [129 N.E. 202, 206].)

The commissioner, however, does not contend in this case that the state legally may include in the measure of the tax all dividend income of foreign corporations doing business here.   Rather, it is his position that, as to foreign corporations doing business in this state, the dividend income may not be included unless the stocks from which the dividends are derived have a business situs here, or the corporation has its commercial domicile here; that as to domestic corporations, all dividend income may be included, subject, of course, to section 8(h) in the case of both foreign and domestic corporations.   Under regulations framed by the commissioner, taxes have been assessed in accordance with this view since 1935. (Ballantine, California Corporation Laws (1932), chap. XX, Franchise Tax Act, by Traynor, pp. 703-705; 17 Cal.L.Rev. pp. 515-516.)   This policy was first embodied in a formal regulation adopted by the commissioner on December 4, 1936, which concluded as follows: ''This regulation shall be applied in the computation of taxes based upon income for the calen-

dar year 1934, fiscal years ended during that year, and all subsequent fiscal or calendar years.'' The tax in the case herein, as noted above, is for the year 1935, based on income for the calendar year 1934. ■ However, if the regulation excludes from the measure of the tax income which this state may lawfully include, the commissioner's regulation is in conflict with the statute and to that extent void. If the state can constitutionally include all dividend income in the measure of the tax imposed on foreign corporations doing business here (subject to § 8(h)), as the statute purports to do, it is unnecessary to consider whether, as the commissioner contends, plaintiff has a commercial domicile here and whether, by reason of that fact, its dividend income is taxable here. We shall, therefore, consider the extent of the state's power in this connection.

For tax purposes a situs is ascribed to intangible property. Traditionally, and based on the principle of *mobilia sequuntur personam,* their situs is at the domicile of the owner. In the case of a corporation its legal domicile is generally in the state where it was incorporated. In more recent years, intangibles have been declared to have a business situs in a jurisdiction other than the legal domicile of the owner when connected with business conducted in such other jurisdiction. Since certain decisions of the Supreme Court of the United States sanction double taxation of intangibles as violating no rights under the federal Constitution, this species of property may for tax purposes have a situs in more than one jurisdiction. (*State Tax Commission* v. *Aldrich,* 316 U.S. 174 [62 S.Ct. 1008, 86 L.Ed. 1358, 139 A.L.R. 1436]; *Graves* v. *Schmidlapp,* 315 U.S. 657 [62 S.Ct. 870, 86 L.Ed. 1097, 141 A.L.R. 948]; *Graves* v. *Elliott,* 307 U.S. 383 [59 S.Ct. 913, 83 L.Ed. 1356]; *Curry* v. *McCanless,* 307 U.S. 357 [59 S.Ct. 900, 83 L.Ed. 1339, 123 A.L.R. 162]; *Cream of Wheat Co.* v. *Grand Forks County,* 253 U.S. 325 [40 S.Ct. 558, 64 L.Ed. 931].) But it is held that intangibles do not have a situs for taxation in a state merely because the corporation which owns them does some of its business there.

For example, a franchise tax imposed on a foreign corporation doing business within a state and measured by the value of *all* its capital stock, is invalid as to foreign corporations which own property without the state. (*Western Union Tel. Co.* v. *Kansas,* 216 U.S. 1 [30 S.Ct. 190, 54 L.Ed. 355]; *Pull-*

*man Co.* v. *Kansas,* 216 U.S. 56 [30 S.Ct. 232, 54 L.Ed. 378] ; *Looney* v. *Crane Co.,* 245 U.S. 178 [38 S.Ct. 85, 62 L.Ed. 230] ; *International Paper Co.* v. *Massachusetts,* 246 U.S. 135 [38 S.Ct. 292, 62 L.Ed. 624] ; *Cudahy Packing Co.* v. *Hinkle,* 278 U.S. 460 [49 S.Ct. 204, 73 L.Ed. 454] ; *Perkins Mfg. Co.* v. *Jordan,* 200 Cal. 667 [254 P. 614] ; contra, *Horn Silver Mining Co.* v. *New York,* 143 U.S. 305 [12 S.Ct. 403, 36 L.Ed. 164] ; extensive annotation, 105 A.L.R. 11, 27-30.)   The decisions are based on two grounds, that the tax is a direct burden on interstate commerce where the corporation does interstate as well as intrastate business, and, secondly, that it is an attempt to reach for tax purposes property outside the state insofar as the capital stock represents property beyond the limits of the state.   The state cannot tax such property directly.   It cannot do so indirectly through the guise of a franchise tax.

In following the decision in *Western Union Tel. Co.* v. *Kansas, supra,* the court in *International Paper Co.* v. *Massachusetts,* 246 U.S. 135, 142 [38 S.Ct. 292, 62 L.Ed. 624], said of the earlier case that it was there held that a ''license fee or excise of a given per cent of the entire authorized capital of a foreign corporation doing both a local and interstate business in several States, although declared by the State imposing it to be merely a charge for the privilege of conducting a local business therein, is essentially and for every practical purpose a tax on the entire business of the corporation, including that which is interstate, and on its entire property, including that in other States; and this because the capital stock of the corporation represents all its business of every class and all its property wherever located.

''When tested, as it must be, by its substance—its essential and practical operation—rather than its form or local characterization, such a license fee or excise is unconstitutional and void as illegally burdening interstate commerce and also as wanting in due process because laying a tax on property beyond the jurisdiction of the State.''

█    If a state may not measure a franchise tax by the value of the entire capital stock of a foreign corporation which does business and has property both within and without the state, because to do so is to reach property outside the limits of the state, we perceive the law to be that it may not measure the tax by net income from all property of such corporation, in-

cluding income from property without the state; that it may not include in the measure of the tax income from any property which for tax purposes is without the state. (Ballantine, California Corporation Laws (1932), chap. XX, Franchise Tax Act, by Traynor, pp. 703-716; 17 Cal.L.Rev. pp. 512-516.) Decisions of the Supreme Court of the United States sustain taxes measured by net income where provision is made for an allocation or apportionment designed to yield a figure fairly representing the net income from business done within the state or from property having its situs there. (*Butler Bros.* v. *McColgan,* 315 U.S. 501 [62 S.Ct. 701, 86 L.Ed. 991], affirming 17 Cal.2d 664 [111 P.2d 334]; *Underwood Typewriter Co.* v. *Chamberlain,* 254 U.S. 113 [41 S.Ct. 45, 65 L.Ed. 165]; *Bass etc., Ltd.* v. *Tax Com.,* 266 U.S. 271 [45 S.Ct. 82, 69 L.Ed. 282]; *Hans Rees' Sons* v. *North Carolina,* 283 U.S. 123 [51 S.Ct. 385, 75 L.Ed. 879].) It is implicit in these decisions that a formula would not be valid if it assigned to a state as a tax measure income that could not reasonably be said to result from activities or property within its borders.

In *People ex rel. Alpha Portland Cement Co.* v. *Knapp,* 230 N.Y. 48 [129 N.E. 202], the author of the opinion, Mr. Justice Cardozo, clearly indicated his view that a state could not include in the measure of a franchise tax imposed on foreign corporations all income from intangibles without regard to their situs. He said in part: "I think the statute is invalid, in its application to the relator, insofar as it lays upon income a burden that is irrespective of situs of the assets by which income is produced. The power of a state to attach conditions to the transaction of intrastate business by foreign corporations is not unlimited today, whatever under earlier decision it may once have seemed to be. The field of law is one where new rules are in the making. Only the Supreme Court of the nation can definitively fix their content. The judgment of a state court can hardly fail, in the meantime, to be tentative and groping. We must shape our path and our progress by such light as we have. No doubt in the earlier cases there was much said, if not decided, that would seem to emancipate the state from all restrictions in conditioning the local business. [Citing cases.] Later cases have explained and qualified these judgments, and, to the extent of conflict overruled them. [Citing authority.]" (129 N.E. 202, 204.)

It is true that certain statutes have been upheld which in-

clude in the computation of a tax measured by net income the income from tax exempt government securities, although an ad valorem tax or a direct income tax on them would be invalid. (*Pacific Co.* v. *Johnson,* 285 U.S. 480 [52 S.Ct. 424, 76 L.Ed. 893], in California Supreme Court, 212 Cal. 148 [298 P. 489]; *Educational Films Corp.* v. *Ward,* 282 U.S. 379 [51 S.Ct. 170, 75 L.Ed. 400, 71 A.L.R. 1226, with note], also note in 57 A.L.R. 899; *Macallen Co.* v. *Massachusetts,* 279 U.S. 620 [49 S.Ct. 432, 73 L.Ed. 874, 65 A.L.R. 866]; *Flint* v. *Stone Tracy Co.,* 220 U.S. 107 [31 S.Ct. 342, 55 L.Ed. 389]; *Home Ins. Co.* v. *New York,* 134 U.S. 594 [10 S.Ct. 593, 33 L.Ed. 1025]; Traynor, *National Bank Taxation in California,* 17 Cal.L.Rev. 232, 238-257; Ballantine, California Corporation Laws (1932), chap. XX, Franchise Tax Act, 693-703, § 555.) But the present case is governed by the capital stock cases cited above, and not by the exempt securities cases. The absence of a right to tax exempt securities directly does not depend on their being outside the territorial jurisdiction of the state for tax purposes, but on the fact that the state cannot interfere with instrumentalities of the national government. This prohibition is deemed not to condemn a tax which is neither a property tax on the exempt securities, nor a direct income tax on the income derived from them, but a franchise tax measured by net income.

A franchise tax as to foreign corporations is for the privilege of doing business within the state. It is reasonable to measure that tax by net income from business done within the state, or from property within the state, that is, by the fruits of the privilege. It is true that income from business done within the state may include income from interstate business to the extent that it is done within the state, as well as income from purely intrastate business. (*Matson Nav. Co.* v. *State Board of Equal.,* 297 U.S. 441 [56 S.Ct. 553, 80 L.Ed. 791]; in the Supreme Court of California, 3 Cal.2d 1 [43 P.2d 805]; *Wisconsin* v. *Minnesota Min. Co.,* 311 U.S. 452 [61 S.Ct. 253, 85 L.Ed. 274]; *Underwood Typewriter Co.* v. *Chamberlain,* 254 U.S. 113 [41 S.Ct. 45, 65 L.Ed. 165]; *United States Glue Co.* v. *Oak Creek,* 247 U.S. 321 [38 S.Ct. 499, 62 L.Ed. 1135]; *International Shoe Co.* v. *Shartel,* 279 U.S. 429 [49 S.Ct. 380, 73 L.Ed. 781].) This is so although the right to do interstate business within the state does not depend on privilege from the state, which can neither grant

nor deny that right. (*Crutcher* v. *Kentucky*, 141 U.S. 47, 57 [11 S.Ct. 851, 35 L.Ed. 649]; see note, 105 A.L.R. 11-17, citing cases.) But although a foreign corporation does not owe its right to do interstate business to the state, it has the benefit and protection of the law and government of the state in the conduct of that business. There is a reasonable relation, therefore, between the measure of the tax and the rights and benefits enjoyed by the corporation, which is lacking when the state attempts to include income from business or property without the state. (Traynor, *National Bank Taxation in California,* 17 Cal.L.Rev. 232, 249-257.)

From these cases and the reasoning therein, we think there is a fundamental and constitutional limitation on a state's power to tax a franchise, such limitation being that the measure of the tax must bear some reasonable relation to the privilege granted. We think that to include all dividend income in the tax measure where that dividend income is in no way connected with the California franchise granted would be unreasonable and void. We are of the opinion that although the statute as it read in 1935 purported to include in the tax measure all dividend income (subject to § 8h) of foreign corporations doing business here, it is valid only as applied to dividend income derived from stocks which have a taxable situs here. This is recognized by section 10 of the act as it now reads, that section requiring the included income to be "derived from or attributable to sources within this State" and providing that: "income derived from or attributable to sources within this State includes income from tangible or intangible property located or having a situs in this State. . . ." (Stats. 1939, chap. 1050, p. 2944.)

If a corporation is incorporated in this state it has its legal domicile here and by virtue thereof all intangibles owned by it have a situs here for taxation. As to stock owned by foreign corporations doing business here, such stock or its income is taxable within this state only if it is in some way connected with the California franchise granted. The commissioner contends that plaintiff's commercial domicile, its principal place of business, is in this state; that for that reason the stocks have acquired a taxable situs in this state; that this conclusion is supported by certain decisions of the Supreme Court of the United States. These contentions rest on the premise of plaintiff having its commercial domicile in this

state, which turns upon the facts. These were stipulated to by the parties.

Plaintiff operates its railroad transportation business as a common carrier in the states of California, Oregon, Nevada, Utah, Arizona, Texas and New Mexico. This transportation business is known as "Pacific Lines." In addition, plaintiff owns all or part of the stock in other transportation companies, which together with plaintiff's Pacific Lines it designates as its transportation system. It operates a steamship line from New York to New Orleans. It operates no railroad in New York, but its board of directors meets there.

Under its charter plaintiff is without right to operate a railroad in Kentucky, the state of its incorporation. To comply with Kentucky law it maintains an office there, with four employees, the principal one an assistant clerk, who is designated as plaintiff's statutory agent for accepting service of process. Stockholders' meetings are held in Kentucky.

Appellant's track mileage is 13,920.09 miles, of which 54.4 per cent is in California. The next highest mileages are in Oregon and Arizona, 12.96 per cent and 12.39 per cent respectively. Fifty per cent of its operating revenue, or more than $59,000,000, is derived from California, 13.62 per cent from Nevada, and 11.87 per cent from Arizona. Of its payroll, 72.58 per cent is in California, 6.33 per cent in Oregon, 5.70 per cent in Arizona, 3.05 per cent in New York. Plaintiff has 24,107 employees in California, as compared with 1,094 in New York. It has 2,547 employees at its San Francisco office, 128 at the New York office. Of its legal staff, fifty-eight have offices in San Francisco, five in New York. The 166 members of the engineering staff are all in San Francisco, as are the 118 members of the purchasing agent's staff. It has $333,315,907.89 invested in road and equipment in California, $102,281,815.63, in Oregon, the next highest state, and $15,327,325.50 in New York, which figure represents the investment in steamships, tugs, barges and lighters registered at the Port of New York and used in plaintiff's New Orleans-New York steamship service. Thus it appears that plaintiff does substantially more business and has substantially more property in California than in any of the other states where it carries on its activities. Its operating revenue from California is greater than from all other states combined.

Under the by-laws of plaintiff "general management and

supervision of the affairs and policies of the company'' are in a board of fifteen directors, who hold their meetings in New York City. The by-laws also provide for an executive committee of seven, including the chairman of the board, the vice-chairman and the president. The committee holds its meetings in New York.

The by-laws require the chairman, vice-chairman, controller, secretary and treasurer to maintain their offices in New York City, the president and auditor to maintain their offices in San Francisco. The by-laws also make provision for a ''local treasurer,'' with his office in San Francisco. It is provided that the chairman of the board ''shall have general control and management of the affairs, property and business of the Company, subject to the Board of Directors, the Executive Committee and the provisions of the By-laws,'' that the president ''acting under the direction of the chairman, shall have immediate charge of the management, operation and traffic (except traffic under the jurisdiction of the vice-chairman) of the railroads and other properties of the Company.''

It is stipulated that the president spends 90 per cent of his time at his headquarters in San Francisco; that he has immediate charge of the management, operation and traffic of the railroad and other railroad properties of Pacific Lines; that matters relating to investment expenditures and retirements, annual budget covering expenditures for maintenance of way, structures, equipment, advertising, capital account, execution and cancellation of surety bonds relating to the transportation business are under the supervision of the president, but must be approved by the board of directors or the executive committee.

In addition to the president, five vice-presidents, a general manager and assistant secretary maintain their offices in San Francisco. The actual management of the transportation business of the company is divided among these last named California officers under the general supervision of the president. Detailed accounting records of plaintiff's transportation business are kept in San Francisco and the results passed on to New York in the form of ledger balances and financial exhibits. Surplus cash balances not required for the transportation business are forwarded to the treasurer in New York. Payments in connection with maintenance and operation of plaintiff's transportation business are made from the San Fran-

cisco office, including the payroll. During the year 1934 the average bank accounts at depositories amounted to $11,964,959 in California, $7,364,391 in New York, and $2,351,179 in all other states. Budgets for each year's operations and for capital expenditures in improvements of railway equipment for Pacific Lines are compiled at San Francisco and submitted to the board of directors at New York for approval. After the budget has been approved no further authorization by the board is necessary for expenditures for operating expenses unless such expenditures are in excess of the budget or in excess of any special authorization, in which cases there must be approval by the board, the executive committee, or the chairman of the board.

It is stipulated that plaintiff has "its principal place of business in California in the city of San Francisco." Note that plaintiff does not stipulate that San Francisco is its principal place of business, but, rather, its principal place of business in California. It is further stipulated that "plaintiff maintains *a commercial domicile* and headquarters known as its general headquarters in the City of San Francisco, in the State of California, for the management of its transportation business." (Italics added.) Plaintiff does not stipulate that *the* commercial domicile of the company is in San Francisco.

Plaintiff was incorporated in Kentucky in 1884. Collis P. Huntington, Charles Crocker, Leland Stanford and Mark Hopkins, all residents of California, owned a controlling interest in the Central Pacific Railroad Company and in the Southern Pacific Railroad Company, California corporations, and predecessors of the present plaintiff, and in a number of subsidiary railroad corporations. The combined operations of these lines extended from Ogden to San Francisco, from San Francisco to Portland, from San Francisco to Los Angeles, from Los Angeles to New Orleans, and by steamship from New Orleans to New York.

According to the stipulation, the purpose of the four associates in organizing plaintiff was to consolidate their holdings. Thus plaintiff is the successor of two California corporations, with their subsidiaries. Although the stipulation is not explicit, the inference is that the management of these two corporations functioned in California, and until 1901 meetings of plaintiff's board of directors were held in San Francisco. It does not appear from the stipulation just how the meeting

place came to be changed to New York. The brief of the commissioner states that about 1900 the last of the four associates died and eastern interests acquired control of the stock, as a result of which certain functions of plaintiff were transferred to New York.

It does not appear when plaintiff acquired the stocks herein involved with reference to the change of the place of the directors' meetings to New York. The stock certificates are kept in New York City in custody of plaintiff's treasurer there, and dividends are collected and deposited there. It was stipulated that "plaintiff does not engage in the business of buying and selling for profit any of the stocks involved herein, nor were any of such stocks purchased, sold, hypothecated or otherwise disposed of during the year 1934," and that "plaintiff did not engage in trading in such stocks or in any activity with respect thereto other than the receipt and disbursement of dividends from such stock during the times material to this action." The power to vote the stock is vested in the president except when such power is exercised by the chairman. Of these stocks, stock of the par value of $12,000,000 of the Pacific Fruit Express Company is pledged at Washington, D. C., with the Reconstruction Finance Corporation, while stock of the Southern Pacific Railroad Company of a par value of $35,000,000, and stock of Southern Pacific Terminal Company of a par value of $1,999,500, are pledged at New York. The stipulation further recites that plaintiff's stock investments, except as to the stock it owns in "non-affiliated companies," were made as permanent investments. Stocks in other corporations are classified in railway regulation and accounting prescribed by the Interstate Commerce Commission as nonoperating property, and the dividends therefrom are not railroad operating income.

The companies from which plaintiff received the net dividend income of $10,431,539.96 are the following:

1. Southern Pacific Terminal Company, a Texas corporation, described in the stipulation as a "wholly owned subsidiary" of plaintiff. It owns property in Galveston, Texas, consisting of docks, wharves, terminal tracks, a grain elevator, power plant, fuel oil storage plant and 321.8 acres of land. Its properties are operated under lease by Texas and New Orleans Railroad Company, another wholly owned subsidiary of plaintiff.

2. Pacific Fruit Express Company, a Utah corporation, with its principal place of business in San Francisco. Plaintiff owns 50 per cent of its stock. It owns and operates refrigerator cars over plaintiff's lines and other lines throughout the United States, and owns ice manufacturing plants, ice ponds, natural ice houses and car repair shops. Earnings of this company consist principally of car rentals and refrigeration service charges.

3. Pacific Greyhound Corporation, a Delaware corporation. Of its stock outstanding, 200,000 common and 101,962 preferred shares, plaintiff owns 60,000 shares of common stock and 18,000 shares of preferred stock. This corporation is a holding company, which through subsidiaries operates motor coach lines. Its earnings are principally derived from dividends received on stock of Pacific Greyhound Lines, Inc.

4. Rockaway Pacific Corporation, a Delaware corporation, of which plaintiff owns all the stock. Its earnings are derived principally from interest received on a note given in connection with the sale of real property in New York.

5. Rio Bravo Oil Company, a Texas corporation, of which plaintiff owns all the stock, except five qualifying shares. Plaintiff organized the corporation to acquire and develop oil lands, with the intent of using the oil developed in operation of Texas and New Orleans Railroad, wholly owned subsidiary of plaintiff. Its earnings are derived from the operation of oil properties in Texas and Louisiana.

6. Southern Pacific Building Company, a Texas corporation, of which plaintiff owns all the stock except five qualifying shares. It owns and operates a nine-story office building in Houston, Texas, which is occupied under lease by the general Texas offices of plaintiff and of the Texas and New Orleans Railroad.

7. Pacific Motor Transport Company, a California corporation, of which plaintiff owns all the stock. Its principal place of business is at San Francisco. It "conducts a motor transport service, including store-door pick-up and delivery services, using, under contracts with the carriers, as underlying carriers, the Southern Pacific Company and its various railway subsidiaries, together with certain independent rail and truck line connections, in the States of California, Oregon, Nevada and Arizona."

The above corporations are described in the agreed state-

ment of facts as "Affiliated Companies." The taxable dividend income as determined by the commissioner also includes dividends from two corporations which are described as "Non-affiliated Companies."

1. Kansas, Oklahoma & Gulf Railway Company, an Oklahoma corporation, which operates a freight and passenger service in Oklahoma, Kansas and Texas. Plaintiff owns less than 1/10 of 1 per cent of its outstanding capital stock.

2. Standard Oil Company of California, a Delaware corporation, with its principal place of business in San Francisco. Of the 13,102,900 outstanding shares of this company, plaintiff owns 14,292 shares, acquired in exchange for certain other stock.

On these facts the trial court found, "as an inference drawn by the court from the stipulated facts . . . at all times herein involved the commercial domicile of plaintiff was in the State of California, and that plaintiff did not have a commercial domicile in either the State of New York or the State of Kentucky."

The questions now necessary to discuss are whether this finding is supported by the evidence, and if it is, whether, under the facts and the law, these intangibles have acquired a taxable situs in this state. So far as the legal question is concerned, the problem is solely one of constitutional law. As already pointed out, there is no doubt that the statute purports to tax this income, the only question being whether this state constitutionally may do so. The proper determination of this problem requires a discussion of the general principles governing the taxation of intangibles, and a critical analysis of the cases establishing the so-called commercial domicile concept.

There are both logical and legal difficulties in ascribing to intangibles a taxable situs. In their very nature they have no physical location at all. But they constitute a very valuable type of property, and as such should, of course, bear their just burden of the cost of government through taxation. Because of the complexities of modern business organizations operating on a nation-wide or world-wide basis, the difficulties of fairly and constitutionally apportioning the tax burden among the various taxing entities becomes extremely difficult. As already pointed out, the general rule is that intangibles, by an application of the maxim of *mobilia sequuntur personam,* are usually taxable at the domicile of the owner. In the

case of corporations, since a corporation is deemed for most purposes to be domiciled in the state of its incorporation, intangibles are usually taxable in that state. The *mobilia* maxim, of Roman law origin and taken over by the common law, is not limited to intangibles and is not limited to the field of taxation. It means simply that property for certain purposes will be regarded as being located at the domicile of the owner for the purpose of applying the law of that place to it although such property may be actually located elsewhere. (See discussion, Story on Conflict of Laws (8th ed.), pp. 533-540.) The maxim does not apply to the taxation of tangible personal property, such property being taxable in the state where located, unless its presence there is but fleeting and transitory. (*Union R. Transit Co.* v. *Kentucky,* 199 U.S. 194 [26 S.Ct. 36, 50 L.Ed. 150] ; *Frick* v. *Pennsylvania,* 268 U.S. 473 [45 S.Ct. 603, 69 L.Ed. 1058].) The theory as to tangible personal property is that the owner is protected in his ownership and enjoyment of such property by the state where it is located to a greater degree than by the state of his domicile. The rule against double taxation applies to such property.

The rule that ascribed to intangibles a taxable situs at the domicile of the owner developed when corporate operations were less complex than now, and when the practice of incorporating in a state with no intention of doing business there was far less prevalent than at present. Thus it was the fact that the corporation carried on its activities in the state of incorporation and generally had its principal place of business there which led the courts to adopt the *mobilia* rule as to the taxation of intangibles. In such a case the corporation benefited from the functions of government in respect to its activities generally, and in relation to its intangibles, more in that state than in any other. ■ It is still the law that, in the absence of evidence to the contrary, it will be presumed that intangibles have their taxable situs at the domicile of their owner. (*Newark Fire Ins. Co.* v. *State Bd.,* 307 U.S. 313 [59 S.Ct. 918, 83 L.Ed. 1312].) But the courts have consistently recognized that in applying the *mobilia* rule to the taxation of intangibles they were applying a fiction, and for that reason it has been frequently held that the fiction should not be indulged in where the result would be unjust, unreasonable, or undesirable. (*Liverpool & L. & G. Ins. Co.* v. *Orleans Assessors,* 221 U.S. 346 [31 S.Ct. 550, 55 L.Ed. 762, L.R.A. 1915C 903];

*Blackstone* v. *Miller,* 188 U.S. 189 [23 S.Ct. 277, 47 L.Ed. 439]; *De Ganay* v. *Lederer,* 250 U.S. 376 [39 S.Ct. 524, 63 L.Ed. 1042].) .In other words, when the *mobilia* rule was not in accord with the realities of the situation it was either disregarded or held not to preclude another state which had become definitely connected with these intangibles from taxing them or their income. This concept that another state than the state of legal domicile had jurisdiction to tax intangibles was enunciated in a series of cases holding that where the intangibles had acquired a ''business situs'' in a foreign state, that state could tax. The following cases are frequently cited to show the genesis of that rule: *New Orleans* v. *Stempel,* 175 U.S. 309 [20 S.Ct. 110, 44 L.Ed. 174]; *Bristol* v. *Washington County,* 177 U.S. 133 [20 S.Ct. 585, 44 L.Ed. 701]; *State Board of Assessors* v. *Comptoir National,* 191 U.S. 388 [24 S.Ct. 109, 48 L.Ed. 232]; *Metropolitan Life Ins. Co.* v. *New Orleans,* 205 U.S. 395 [27 S.Ct. 499, 51 L.Ed. 853]; *Liverpool & L. & G. Ins. Co.* v. *Orleans Assessors,* 221 U.S. 346 [31 S.Ct. 550, 55 L.Ed 762, L.R.A. 1915C 903].

A short analysis of these cases will serve to illustrate generally the types of factual situations to which the business situs rule has been applied.

In *New Orleans* v. *Stempel, supra,* a resident of New York through an agent in Louisiana made loans evidenced by notes secured by mortgages on real property in Louisiana. The notes and mortgages at all times remained in Louisiana. Payments of principal and interest were deposited in banks in Louisiana to be reinvested through further loans. It was held that the notes, mortgages and bank deposits were taxable in Louisiana.

In *State Board of Assessors* v. *Comptoir National, supra,* a foreign banking company did a lending business in Louisiana. Loans were evidenced by checks drawn on the company's agent in Louisiana, which were treated as overdrafts and secured by collateral. Checks and collateral remained with the agent in Louisiana, and were held taxable there.

In *Bristol* v. *Washington County, supra,* a New York resident through a local agent carried on the business of lending money in Minnesota on notes and mortgages on property in that state. The notes were sent to the domicile of the owner and kept there. The mortgages remained in Minnesota. The right of Minnesota to tax the notes and mortgages was upheld.

It should be emphasized that here the notes were not physically present in the state held to be the business situs of such notes.

*Metropolitan Life Ins. Co.* v. *New Orleans, supra,* and *Liverpool & L. & G. Ins. Co.* v. *Orleans Assessors, supra,* involved credits due New York insurance companies which the state of Louisiana had taxed. In the first of these cases the company had made loans on its policies in Louisiana. Notes given for the loans were forwarded to the home office of the company in New York to be kept there. It was held that the notes were taxable under the Louisiana law. In the second case, overdue premiums for insurance issued to Louisiana residents for which credit had been extended were held subject to taxation in Louisiana. These cases definitely established that the physical evidences of the intangibles did not have to be present in the state claiming to be the business situs of such intangibles. (See, also, *Newark Fire Ins. Co.* v. *State Bd.,* 307 U.S. 313 [59 S.Ct. 918, 83 L.Ed. 1312].)

In these cases, and many more that might be cited, we find an individual or a corporation engaging in activities with its intangible property with a view to profit outside the corporate domicile. In all the business situs cases it was held that the intangibles were so tied in with the activities of their owner carried on in the foreign state and under the protection of the law and government provided by the foreign state, that they had acquired a taxable situs, described as a "business situs" in the foreign state. It was held that the maxim of *mobilia sequuntur personam* did not preclude the imposition of a tax by the state of the business situs imposed for the advantages enjoyed by the owner in that state. These cases also established the principle that for the business situs rule to be applied it is not necessary that the physical evidences of the intangibles should be located in the business situs state. As to whether the state of legal domicile might also tax such intangibles where it is a mere paper domicile the cases are not clear. (See the two opinions in *Newark Fire Ins. Co.* v. *State Bd., supra,* see concurring opinion of Mr. Justice Reed in the four, four, one, decision in *Curry* v. *McCanless,* 307 U.S. 357, 375 [59 S.Ct. 900, 83 L.Ed. 1339, 123 A.L.R. 162].) At any rate we do know, under the rule of the cases heretofore cited, that the fact that double taxation of the intangibles might result is not necessarily a constitutional bar to both states imposing a tax on the same intangibles.

The business situs cases are based on the realities of the situation. When a corporation carries on its activities in a foreign state and uses its intangibles there, it should pay a tax for the protection and benefits it receives from the law of that state. In speaking of the above cited business situs cases later decisions have characterized the intangibles there involved as "integral parts of some local business." (*Wheeling Steel Corp.* v. *Fox*, 298 U.S. 193, 210 [56 S.Ct. 773, 80 L.Ed. 1143]; see, also, *Farmers Loan & T. Co.* v. *Minnesota,* 280 U.S. 213 [50 S.Ct. 98, 74 L.Ed. 371]; *Beidler* v. *South Car. Tax Commission,* 282 U.S. 1 [51 S.Ct. 54, 75 L.Ed. 131]; *First National Bank* v. *Maine,* 284 U.S. 312 [52 S.Ct. 174, 76 L.Ed. 313, 77 A.L.R. 1401].) This does not mean that the business must be local in the sense of being confined to a single state, but simply that the intangibles must be associated with that portion of the business carried on in the state which claims business situs. The business itself may be part of an enterprise extending over a number of states, as in *Metropolitan Life Ins. Co.* v. *New Orleans, supra,* and *Liverpool & L. & G. Ins. Co.* v. *Orleans Assessors, supra.*

In recent years the doctrine that the state of the business situs of intangibles may tax has been greatly extended. It is extremely difficult to tell the exact limits of the doctrine. Each case must turn upon its own facts, and from those facts it must be determined whether in that case the business situs of the particular intangibles in fact and in law, is in the taxing state. One of the extensions of the business situs rule, or perhaps an independent exception to the *mobilia* rule, is to be found in those cases that hold that the foreign state where a corporation has established its "commercial domicile," at least in reference to the intangibles in question, has jurisdiction to tax those intangibles. The three cases that are cited as establishing this rule are *Wheeling Steel Corp.* v. *Fox*, 298 U.S. 193 [56 S.Ct. 773, 80 L.Ed. 1143]; *First Bank Stock Corp.* v. *Minnesota,* 301 U.S. 234 [57 S.Ct. 677, 81 L.Ed. 1061]; *Smith* v. *Ajax Pipe Line Co.,* 87 F.2d 567. The commissioner places his main reliance to support his holding that the income from the securities here involved are taxable by this state upon these cases. He contends that, under the rule there announced, where the state of incorporation is a paper domicile, a mere technical legal domicile, in which the corporation carries on none of its activities, such corporation may be

said to have its domicile in fact, its commercial domicile, in that state where it has its principal place of business, and that state, in return for the advantages, opportunities and protection accorded the corporation in the conduct of its business there, may tax the intangibles of such corporation.

These cases must be carefully analyzed to ascertain the factual situations there presented, and to ascertain the exact rules of law there announced. In the Wheeling Steel Corporation case, *supra,* the State of West Virginia levied an ad valorem property tax on accounts receivable and bank deposits of the plaintiff, a Delaware corporation. The corporation manufactured products for sale. Its principal manufacturing plants were located in Ohio, although it did some manufacturing in West Virginia. It maintained sales offices in a number of states. It had designated a "principal place of business" in Delaware in compliance with the law of that state, where it maintained an office through the Corporation Service Company. This designation, says the opinion, "was a technical one" and that office was "not a principal office so far as the actual conduct of business is concerned." (P. 211.) The "general business offices" (p. 205) of the corporation were located at Wheeling, West Virginia. The board of directors and the stockholders met in West Virginia and the officers resided there. The accounts receivable upon which the tax was levied were for goods sold to purchasers throughout the United States. Although contracts were negotiated and orders taken at the various sales offices, they were subject to acceptance or rejection at the Wheeling office and accounts due were payable there. Of a total of $2,234,743.11 accounts and notes receivable, $374,410.42 was for goods sold and manufactured in and shipped from West Virginia. The corporation had been assessed in Ohio on accounts and notes receivable amounting to $250,133.42. The lower court in West Virginia had permitted the deduction of this amount in determining the tax due West Virginia, and the defendant Tax Commissioner had not appealed therefrom.

Checks and drafts in payment of accounts after receipt in West Virginia were sent in their original form to banks in several states for deposit. The tax was assessed against the bank accounts in other states as well as against those in West Virginia banks. The deposits were not segregated for the purpose of keeping separately receipts from products manu-

factured in West Virginia. Ordinarily, the opinion says, not more than 20 per cent of the total on deposit within and without West Virginia was from the sale of products manufactured in that state. At least 80 per cent of the sums spent by the corporation in the conduct of its business were for operations of its plants and business outside West Virginia. Of real and tangible personal property of the corporation of an assessed value of $31,977,600, 27 per cent, or an assessed value of $8,673,205, was in West Virginia.

The court held that the accounts receivable and bank deposits had their situs for tax purposes in West Virginia. The court said: "The accounts receivable with which we are now concerned are the proceeds of contracts of sale. While these contracts are negotiated and orders are taken at the various sales offices throughout the country, they are subject to acceptance or rejection at the Wheeling office. All invoices are payable at Wheeling. Thus the contracts of sale become effective by the action taken at the Wheeling office and there the accounts are kept and the required payments are made. In the face of these facts, it cannot properly be said that the credits arise either where the goods are manufactured or at the sales offices where the orders are taken. The tax is not on the manufacturing or on the privilege of maintaining sales offices. The tax is on the net profits of a unitary enterprise demanding a method, not intrinsically arbitrary, of making an apportionment among different jurisdictions with respect to the processes by which the profits are earned." (P. 212.)

Of the bank deposits the court said: "It appears that the Corporation has deposit accounts in several states. The deposits outside West Virginia were made by sending from the Wheeling office to the various banks the original checks or drafts received by the Corporation from its customers. From these deposit accounts the Corporation, by executive action at Wheeling, pays the amounts required for payrolls, materials, equipment, maintenance and operating expenses as these amounts become payable in the course of its operations in Ohio and other States. Checks and drafts on these bank accounts are drawn at Wheeling, except in connection with the payment of payrolls at certain manufacturing plants where payroll checks or orders are drawn against moneys sent to banks at such points for that express purpose and for meeting incidental items. The agreed statement shows that 'All

moneys are controlled and the expenditures directed by the Wheeling office, and if the immediate expenditure be made elsewhere, such immediate expenditure is made only under specific or general direction and control of the Wheeling office.' The so-called 'money in bank' is not cash or physical property of the Corporation but is an indebtedness owing by the bank to the Corporation by virtue of the deposit account. From the Wheeling office proceed the items deposited and there the withdrawals are directed and controlled. In the light of this course of business as shown by the agreed statements of fact, we find no sufficient basis for concluding that the bank accounts thus maintained and controlled were properly attributable to the Corporation at any place other than at its general office at Wheeling. If there were any special circumstances by which any of these deposits could be deemed to have been localized elsewhere, they do not appear upon the present record." (Pp. 213-214.)

The court further said: "The Corporation established in West Virginia what has aptly been termed a 'commercial domicile.' It maintains its general business offices at Wheeling and there it keeps its books and accounting records. There its directors hold their meetings and its officers conduct the affairs of the Corporation. There, as appellant's counsel well says, 'the management functioned.' The Corporation has manufacturing plants and sales offices in other States. But what is done at those plants and offices is determined and controlled from the center of authority at Wheeling. The Corporation has made that the actual seat of its corporate government." (Pp. 211-212.)

In speaking of the rights of Delaware, the legal domicile of the corporation, the court said: "To attribute to Delaware, merely as the chartering State, the credits arising in the course of the business established in another State, and to deny to the latter the power to tax such credits upon the ground that it violates due process to treat the credits as within its jurisdiction, is to make a legal fiction dominate realities in a fashion quite as extreme as that which would attribute to the chartering State all the tangible possessions of the corporation without regard to their actual location." (P. 211.)

In *Smith* v. *Ajax Pipe Line Co.*, 87 F.2d 567, an ad valorem property tax assessed by Missouri on bank deposits in New York of a Delaware corporation doing business in Missouri

was held legal on the authority of the Wheeling case. The business of the company consisted of transportation of crude oil for hire by means of two pipe lines extending from Oklahoma through Missouri into Illinois. In Illinois the oil was delivered into the pipe lines of others for further transportation. The pipe lines which made delivery to the consignee collected the total charge and deposited the company's share in a New York bank. It conducted no business in Delaware, the state of its incorporation.

The company's "general office" was in Missouri. All meetings of the board of directors were held at the office in Missouri. The stock of the company was owned by a holding company, of which the court says that it apparently "determined the general policies and made the contracts for appellee. The nearest direct testimony is that 'They [the board of directors of appellee] had absolute control, subject to certain limitations by the parent company, that is limitations placed upon them by a holding company. I would say the board at Springfield could not say the accounts receivable should be paid into the Chase National Bank, even though we were a majority of the board of directors of the Ajax Company, because we had certain fixed policies that we followed in connection with the parent company.' " (P. 571.)

The court further says, "The corporate direction, insofar as general policies, seems to have been by a holding company." (P. 569.) Of the Missouri office the court said, "All operations were conducted from there except no contracts for nor collections for carriage of oil were made there nor did the men there 'shape the internal policy' of appellee." (P. 569.)

The court refers to "commercial situs" of the company as follows: "What constitutes this 'business situs' or 'commercial situs' has not been, probably cannot be, definitely defined. Whether it exists is usually the crucial inquiry in this character of cases." (P. 571.)

The third case, and the last in point of time, is *First Bank Stock Corp.* v. *Minnesota*, 301 U.S. 234 [57 S.Ct. 677, 81 L.Ed. 1061]. The State of Minnesota levied a property tax on shares of stock in Montana and North Dakota state banks owned by appellant, which was incorporated under the law of Delaware. The Supreme Court of the United States affirmed the legality of the tax. The taxpaying corporation owned all stock of a number of state banks, trust companies and other financial

institutions incorporated in other states, including those in Montana and North Dakota, and each doing business in the state of its incorporation. The States of Montana and North Dakota had imposed taxes on the shares of the banks incorporated there. The appellant had paid without protest the tax on shares of stock in banks of states other than Montana and North Dakota, which other states did not attempt to impose a tax on shares issued by banks organized under their own laws.

The appellant corporation held its stockholders' and directors' meetings in Minnesota. The stock certificates were kept there, and there it received dividends on the stock and distributed them.

The court said of the corporation's activities: "Through a wholly-owned subsidiary corporation, organized and doing business in Minnesota, it maintains a compensated service for the banks which it controls. It offers advice as to their accounting practices, makes recommendations concerning loans, commercial paper, and interest rates, and makes suggestions regarding their purchase and sale of securities. It also plans for them advertising campaigns, and supplies advertising material. *Appellant thus maintains within the state an integrated business of protecting its investments in bank shares, and enhancing their value, by the active exercise of its power of control through stock ownership of its subsidiary banks.*" (P. 237. Italics added.)

The court also said: "Appellant is to be regarded as legally domiciled in Delaware, the place of its organization, and as taxable there upon its intangibles [citing case], at least in the absence of activities identifying them with some other place as their 'business situs,' but it is plain that the business which appellant carries on in Minnesota, or directs from its offices maintained there, is sufficiently identified with Minnesota to establish a 'commercial domicile' there, and to give a business situs there, for purposes of taxation, to intangibles which are used in the business or. are incidental to it, and have thus 'become integral parts of some local business.' [citing cases.]

"The doctrine that intangibles may be taxed at their business situs, as distinguished from the legal domicile of their owner has usually been applied to obligations to pay money, acquired in the course of a localized business. [Citing cases.] But it is equally applicable to shares of corporate stock which,

because of their use in a business of the owner, may be treated as localized, for purposes of taxation, at the place of the business. [Citing cases.] Appellant's entire business in Minnesota is founded on its ownership of the shares of stock and their use as instruments of corporate control. They are as much 'integral parts' of the local business as accounts receivable in a merchandising business, or the bank accounts in which the proceeds of the accounts receivable are deposited upon collection. (Compare *Wheeling Steel Corp.* v. *Fox, supra,* 298 U.S. 212-214, 80 L.Ed. 1149, 1150, 56 S.Ct. 773.) Thus identified with the business conducted by appellant in Minnesota, they are as subject to local property taxes as they would be if the owner were a private individual domiciled in this state. . . .

''The economic advantages realized through the protection, at the place of domicile, of the ownership of rights in intangibles, the value of which is made the measure of the tax, bear a direct relationship to the distribution of burdens which the tax effects. These considerations support the taxation of intangibles at the place of domicile, at least where they are not shown to have acquired a business situs elsewhere, as a proper exercise of the power of government. Like considerations support their taxation at their business situs, for it is there that the owner in every practical sense invokes and enjoys the protection of the laws, and in consequence realizes the economic advantages of his ownership.'' (P. 241.)

The fact that a corporation may have a commercial domicile as defined in these cases separate from its legal domicile, has been recognized, and the Wheeling case cited with approval, in *Memphis Nat. Gas Co.* v. *Beeler,* 315 U.S. 649, 652, 656 [62 S.Ct. 857, 86 L.Ed. 1090]; *Southern Nat. Gas Corp.* v. *Alabama,* 301 U.S. 148, 154 [57 S.Ct. 696, 81 L.Ed. 970]; *Wirt Franklin Petroleum Corp.* v. *Gruen,* 139 F.2d 659; *Maryland & Va. Milk Producers' Assn.* v. *Dist. of Columbia,* 119 F.2d 787; *Cargill* v. *Spaeth,* 215 Minn. 540 [10 N.W.2d 728]; see, also, *Chestnut Securities Co.* v. *Oklahoma Tax Commission,* 125 F.2d 571.

In *Memphis Nat. Gas Co.* v. *Beeler, supra,* the transcript shows that the board of directors did not meet in the state held to be the commercial domicile. That this was the fact in *Maryland & Va. Milk Producers' Assn.* v. *Dist. of Columbia, supra,* appears from the opinion. (P. 788.)

■ Now how do the rules established by the above cases apply to the facts of the present case? We find here a Kentucky corporation that not only does not, but under its charter cannot, engage in the railroad business in the state of its incorporation. That corporation owns millions of dollars of stocks and bonds, and neither they nor their income are taxed in Kentucky. The actual securities are in New York where the dividends are collected and banked. The board of directors of the corporation meets in New York. Some of its officers are there. New York has not taxed the stocks or bonds or their income. Thus, neither the state of domicile, nor the state where the securities are located has attempted to tax the income in question. This is an important, but by no means conclusive, factor. If another state claimed to be the commercial domicile or claimed the securities had a business situs there, and had purported to tax the income, that fact would at least indicate that there was a material conflict between taxing entities over where the taxable situs of this stock was located. But here no such conflict has been claimed. Plaintiff does urge that New York is the business situs of the stock, that while California is a commercial domicile of its railroad transportation business, New York is its commercial domicile as to its holding company activities. We have held above that plaintiff's holding company activities did not constitute a doing of business. Plaintiff stipulated that it engaged in no activities with respect to the stocks here involved except the receipt and disbursement of dividends. There is no sound basis for holding that New York constituted a separate commercial domicile as to activities of plaintiff which did not even constitute a doing of business, and which, as hereafter pointed out, were not truly separate and disconnected from its railroad transportation business, but, on the contrary, served the interests of that business.

■ The fact that the board of directors of plaintiff meets in New York is an important, a very important factor, to be considered in determining whether California is in fact the commercial domicile of this company. But that factor is not conclusive. Thus in *Memphis Nat. Gas Co.* v. *Beeler,* and in *Maryland & Va. Milk Producers' Assn.* v. *Dist. of Columbia,* above cited, the commercial domicile was in a state other than the one in which the board met. That the state where ultimate control is exercised is not necessarily the commercial domicile

is implicit in the holding in *Smith* v. *Ajax Pipe Line Co.*, 87 F.2d 567, where the stock of the corporation involved was wholly owned, and therefore the corporation was ultimately controlled, by a holding company located outside the taxing state. When a corporation severs its ties with the state in which it is incorporated and engages in no corporate activities there, but engages in activities elsewhere, the contention that, as a matter of law the only state that can possibly be held to be its commercial domicile is that state where its board of directors meets, is as unrealistic, unsound, and artificial as the concept that the corporation for all tax purposes is domiciled in the state of incorporation. It was to free the law from this last mentioned artificial and fictional concept that the concepts of business situs and commercial domicile were applied by the courts. The true test must be to consider all the facts relating to the particular corporation, and all the facts relating to the intangibles in question, and to determine from those facts which state, among all the states involved, gives the greatest protection and benefits to the corporation, which state, among all the states involved, from a factual and realistic standpoint is the domicile of the corporation. That is partially a question of fact and partly a question of law.

So far as plaintiff's railroad transportation business is concerned, there can be no doubt that substantially more activities are carried on, more actual control is exercised, more protection is given this corporation, and more benefits conferred on it by California than by any other state. This is admitted. The securities involved are not totally unrelated to this transportation business. An examination of the stipulation of facts relating to the businesses of the corporations whose stocks are owned by plaintiff will demonstrate that all but one or two of them are engaged in businesses related to, and most of them directly connected with, plaintiff's transportation business. Indeed, in the stipulation, they are described as "affiliated companies." All but one or two of them underlie the transportation business of plaintiff. The Pacific Fruit Express Company, from whom the major portion of the dividends were received, is directly connected with plaintiff's corporation. It is true that such relationship is based upon contract, but can we be so unrealistic as to believe that the ownership of 50 per cent of that company's stock by plaintiff, in no way connects the transportation business of plain-

tiff with that company? Of course not. The same can be said in varying degrees as to the other stocks involved. None of them were stocks of unrelated companies. All of them obviously were owned by plaintiff to further its transportation business. They play a part in the conduct of that transportation business of which the commercial domicile is in this state. They obviously enter into the exercise of the franchise granted by this state. All but one or two of them in greater or lesser degree, were in companies whose businesses were connected or related to that of plaintiff.

Under such circumstances, we are of the opinion that this tax statute is constitutional as applied to the income here involved. We perceive the law to be that where the corporation has only a paper domicile, where the only function performed by the state of incorporation is to breathe life into the corporation, and where no substantial corporate activities are thereafter carried on in that state, then the law looks at such corporation and says that that state where, under the facts, the corporation receives its greatest protection and benefits, that state where the greatest proportion of its control exists, that state shall be the commercial domicile, with constitutional power to tax income from intangibles. Whether the commercial domicile is on a parity with the legal domicile, whether its power to tax is the same as that of the legal domicile, or whether it becomes a complete substitute for the technical domicile for tax purposes, are questions not yet decided by the United States Supreme Court, and not involved in this case. Until the highest court speaks on these interesting but exceedingly difficult questions, a state court can merely give its best judgment as to their solution. But, here we are not faced with the necessity of deciding those questions. Here, the evidence shows that the main business of plaintiff has its commercial domicile here. The securities, the income from which is included in the measure of the tax, are reasonably connected with that business. As a matter of both fact and law the commercial domicile of the corporation is here, realistic control is here, and the statute in purporting to include the challenged income is therefore constitutional.

In an attempt to overthrow this conclusion, plaintiff urges that its dividend income must either be separable from its railroad operating income, in which event its situs is not in California, but in New York or Kentucky, or if not separable

it is subject to unitary allocation as is the income from plaintiff's railroad transportation operations.

There is, of course, no difficulty in segregating plaintiff's dividend income from its railroad operating income, and hence no reason for applying the unitary allocation formula to that dividend income. It is held above that plaintiff's dividend income is not income from "business done," and that only income from business done is allocated by § 10. The state may include in the measure of its tax, free from constitutional objection, all income from intangibles which have a situs in this state for tax purposes. Plaintiff's dividend income is separable from its railroad operating income to the extent that it is not subject to unitary allocation. But since plaintiff owns and holds stock in other corporations to advance the interests of its transportation business, the connection between its stock ownership and its railroad transportation business is such that the stocks owned may be said to be integrally connected with that business, and, in our view, subject to taxation at the commercial domicile of that business.

The judgment appealed from is affirmed.

Knight, J., and Ward, J., concurred.