[Civ. No. 24756.    First Dist., Div. Four.    Dec. 20, 1968.]

FIBREBOARD PAPER PRODUCTS CORPORATION, Plaintiff and Appellant, v. FRANCHISE TAX BOARD, Defendant and Respondent.

Hart H. Spiegel, John M. Haff, Jr., and Brobeck, Phleger & Harrison for Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General, and John J. Klee, Jr., Deputy Attorney General, for Defendant and Respondent.

RATTIGAN, J.—Fibreboard Paper Products Corporation appeals from the judgment in its action to recover a refund of corporate franchise tax, contending that respondent Franchise Tax Board incorrectly treated certain items of income and expense in measuring the tax imposed upon appellant for the year 1957.

The cause was submitted, and decided by the trial court, on a written stipulation of facts which included a narrative and several documents which were attached thereto and incorporated in the stipulation by reference. Because the facts are extensive and intricate, we need not recite the full stipulation.

The income in question was received, and the expense item was incurred and paid, by Fibreboard Products, Inc., a corporation ("Fibreboard"), in 1956. Appellant and Fibreboard merged on December 31, 1956. As "successor by merger" and pursuant to Revenue and Taxation Code[1] sections 23251 and 23253, appellant included Fibreboard's 1956 income and expense in the computation of the franchise tax imposed upon it (appellant) for the year 1957.

Respondent board assessed an additional tax upon appellant for 1957, based upon respondent's treatment of the Fibreboard income and expense items in question here. Appellant paid the additional tax and filed a claim for refund. When the claim was denied, appellant brought this action to recover the additional tax pursuant to section 26102.

The trial court found for respondent board on all issues presented by the stipulated facts, and entered judgment that appellant take nothing in the action. This appeal followed.

In 1956, Fibreboard was engaged in the business of manufacturing and selling paperboard and paperboard containers. Its operations comprised a unitary business, conducted both within and without California. Fibreboard was a Delaware corporation, but maintained its principal place of business and its commercial domicile in this state.

The issue involving Fibreboard's income is wholly separate from that presented by the expense item, and we herinafter treat the issues separately.

---

[1] All section references herein are to the Revenue and Taxation Code.

### The Income Issue

■ During 1956 Fibreboard owned certain interest-bearing securities. Some of these (a bond issued by a private corporation and other bonds of local governments, the State of California and the United States) were carried as a "long-term investment." The other securities (treasury notes, certificates of indebtedness, and treasury bills, all issued by the United States) were carried as a "current asset."

Fibreboard held the long-term investment securities as a reserve against losses of the unitary business—to be sustained from earthquakes, riots, strikes, civil commotions and workmen's compensation claims—for which it did not carry commercial insurance. The amounts of money invested in the current-asset securities were those estimated to be necessary in order to meet federal and state income and franchise tax obligations of Fibreboard's unitary business.

In 1956 Fibreboard received income from the securities held in both categories: interest from some of them, capital gains realized from the sale or exchange of others. In its franchise tax return covering the year 1956, appellant included a percentage of this income in the measure of its franchise tax for the year 1957. Respondent Franchise Tax Board included all of the income in the measure of the tax, and assessed the additional tax upon the basis of the higher income thus computed. The board's treatment of the income was challenged by appellant in this action; the trial court upheld it.

The matter in controversy involves the "unitary business" concept, which is a significant factor in the process wherein a state imposes a tax based upon the income of a taxpayer who conducts business both within and without the taxing state. (See, generally, *Butler Bros.* v. *McColgan* (1941) 17 Cal.2d 664 [111 P.2d 334], affd. 315 U.S. 501 [86 L.Ed. 99, 62 S.Ct. 701]; Report by the Assembly Interim Committee on Revenue and Taxation (1964) Taxation of Corporate Income in California, 4 Assembly Interim Com. Report No. 17, p. 36 et seq.; Keesling and Warren, *The Unitary Concept in the Allocation of Income* (1960) 12 Hast.L.J. 42; Wahrhaftig, *Allocation Factors in Use in California* (1960) 12 Hast.L.J. 65.[2] See also Altman and Keesling, Allocation of Income in State Taxation (2d ed. 1950).)

When a corporate taxpayer receives income from its busi-

---

[2] The three sources last named are hereinafter cited as "Committee Report," "Keesling and Warren," and "Wahrhaftig," respectively.

ness activities conducted both within and without this state, California imposes upon the taxpayer a franchise tax measured by that portion of its total net income which is "derived from or attributable to sources within this State." (Section 25101.[3] Regulation 25101, subd. [a].[4]) The measurement requires that the corporation's income from "sources" in California be segregated from its total multi-state income. (Keesling and Warren, p. 42.) By statute, the Franchise Tax Board has a broad discretion in employing an appropriate method of segregation in a given case (*id.*) : i.e., a method of determining such portion or portions of the total as are "income derived from or attribtuable to sources within this State." (§ 25101.)

One such method is "specific allocation," under which all income derived from property owned by the corporation may be allocated to California if the property is located in this state. (Keesling and Warren, p. 42.) This is because "income derived from or attributable to sources within this State," which is the measure of the corporation's franchise tax (§ 25101), "includes income from tangible or intangible property located or having a situs in this State." (§ 23040.) The other method involved in the present case is "formula allocation," under which a three-factor arithmetical computation[5]

---

[3]As pertinent, section 25101 provides as follows:

"When the income of a taxpayer subject to the . . . [corporate franchise tax] . . . is derived from or attributable to sources both within and without the State, the tax shall be measured by the net income derived from or attributable to sources within this State. Such income shall be determined by an allocation upon the basis of sales, purchases, expenses of manufacture, pay roll, value and situs of tangible property or by reference to any of these or other factors or by such other method of allocation as is fairly calculated to determine. the net income derived from or attributable to sources within this State. Income from business carried on partly within and partly without this State shall be allocated in such a manner as is fairly calculated to apportion such income among the states or countries in which such business is conducted. Income attributable to isolated or occasional transactions in states or countries in which the taxpayer is not doing business shall be allocated to the state in which the taxpayer has its principal place of business or commercial domicile.

". . . . . . . . . . . . ."

[4]References to "regulations" herein are to the Franchise Tax Board regulations published in title 18, California Administrative Code, subchapter 3.5 ("Bank and Corporation Tax [Taxable years beginning after 12-31-54]").

[5]The three factors are the corporation's respective California percentages of its total tangible property, payroll and sales, which are determined and averaged to produce the percentage figure mentioned. (Committee Report, p. 36.)

produces a dollar portion thereof which is reasonably "derived from or attributable to sources within this State." (§ 25101; reg. 25101, subd. [a]; Keesling and Warren, pp. 43-45; Wahrhaftig, p. 70 et seq. See *McDonnell Douglas Corp.* v. *Franchise Tax Board* (1968) 69 Cal.2d 506, 529, 530 [72 Cal.Rptr. 465, 446 P.2d 313].)

Appellant formula-allocated to California a percentage[6] of Fibreboard's income from its securities; respondent Franchise Tax Board specifically allocated all of it. We hold that the board's action was correct, and that the trial court properly upheld it.

As we view the two methods of allocation, the essential distinction between them arises from the fact that the Franchise Tax Board has the responsibility of segregating the multistate income of the unitary business as between that derived from California "sources" and that derived from "sources" elsewhere. The board properly uses specific allocation when the income is determined by law, from the facts presented, to have a "source" in California. Where it is not, the formula allocation method is used to accomplish the same result, but by the artifice of formulary arithmetic rather than under the realities of fact and law.

In the present case, the realities control: Fibreboard's investment income had a California "source" under the facts and the law. The income-producing securities were intangibles. Under the doctrine of *mobilia sequuntur personam,* the situs of intangible property is at the domicile of the owner. (*Southern Pac. Co.* v. *McColgan* (1945) 68 Cal.App.2d 48, 58, 68-69 [156 P.2d 81].) A domestic corporation—i.e., one incorporated under the laws of California—has its legal domicile in this state; by virtue thereof, its intangibles have a situs here for purposes of taxation. (*Id.* at p. 62.) And intangibles owned by a foreign corporation doing business in California have a "taxable situs" here if the corporation maintains a "commercial domicile" in this state. (*Id.* at pp. 62, 81.)

Since the last-stated facts applied to Fibreboard in 1956, its securities had a California situs. Accordingly, the income produced by them was "income from . . . intangible property . . . having a situs in this State," which is "income derived from or attributable to sources within this State" (§ 23040); which, as such, was properly to be included in the measure of

[6]The parties agree in their stipulation that the percentage allocated (68.904%) was correct if the income was properly allocated by formula.

appellant's franchise tax (§ 25101); and of which, for these reasons, specific allocation to California was proper.

Appellant, contending to the contrary, first argues that the *mobilia* doctrine was "rejected" by the Supreme Court in *Holly Sugar Corp.* v. *Johnson* (1941) 18 Cal.2d 218 [115 P.2d 8]. But that decision holds that, where a foreign corporation is engaged in a unitary business in California and elsewhere, intangibles owned by it may acquire a taxable situs in this state by reason of their association with the local phase of the unitary business (*id.* at pp. 223, 227), and that this may occur although the corporation's domicile is in another state. (*Id.* at p. 223.) The court thus stated an "exception" (*id.*) to the *mobilia* doctrine which may arise on facts (see *Miller* v. *McColgan* (1941) 17 Cal.2d 432, 444 [110 P.2d 419, 134 A.L.R. 1424]) which have no relevance here. The *Holly Sugar* court expressly affirmed the *mobilia* doctrine as such (*id.*), and it operates in the present case to give Fibreboard's securities a taxable situs in California. (*Southern Pac. Co., supra,* 68 Cal. App.2d 48 at pp. 62, 81.)

Appellant also contends that the income from Fibreboard's securities should be treated as unitary because Fibreboard held the securities for unitary purposes (to fund the payment of unitary obligations, as heretofore described), and because it is not shown that Fibreboard, investing its funds in the securities, intended to withdraw the funds from the unitary business for the extraneous—i.e., nonunitary—purpose of making money from an investment. (See Wahrhaftig, p. 68.) But income from California-sited intangibles is from a California "source" because section 23040 says it is, and the statute does not provide that the "source" of such income may be qualified by the purpose for which the intangibles are held.

The effect of section 23040 in this regard distinguishes two Minnesota decisions upon which appellant relies. (*Great Lakes Pipe Line Co.* v. *Commissioner of Taxation* (1965) 272 Minn. 403 [138 N.W.2d 612]; *Montgomery Ward & Co.* v. *Commissioner of Taxation* (1967) 276 Minn. 479 [151 N.W.2d 294].) In each of these cases income from securities was held to be allocable to Minnesota by formula as unitary income, but the result was reached under a statute which required such treatment of "income from intangible property *employed in* . . . [the unitary] . . . business" (italics added); the situs of the intangibles was not involved in either case, and it was apparently outside Minnesota in both. Hence, "purpose," not

"source," controlled; in the present case, "source" controls under section 23040 because Fibreboard's securities had a situs in California.

Appellant has cited an array of decisions by the State Board of Equalization[7] bearing upon the treatment of income from intangibles owned by a corporation engaged in a unitary business in California and elsewhere. In such one line of decisions, the state board has treated such income as unitary upon the ground that the intangibles in each case were held as an "integral part" of the unitary business. (*Appeal of Marcus-Lesoine, Inc.* (Nov. 15, 1939) 2 Cal. Tax Cases 218, 219;[8] *Appeal of Houghton Mifflin Co.* (Mar. 28, 1946) 3 Cal. Tax Cases 321, 322; *Appeal of International Business Machines Corp.* (Oct. 7, 1954) 6 Cal. Tax Cases 5, 6; *Appeal of National Cylinder Gas Co.* (Feb. 5, 1957) 6 Cal. Tax Cases 153, 154; *Appeal of American Snuff Co.* (Apr. 20, 1960) 8 Cal. Tax Cases 101, 106. See Wahrhaftig, pp. 66-68.)

Following the same factual standard but reaching an opposite result, the State Board of Equalization has held that income from securities held as investments—as in the present case—is to be treated as nonunitary because an investment is not an integral part of a unitary business which is not carried on for the purpose of investing money. (*Appeal of American Airlines, Inc.* (Dec. 18, 1952) 5 Cal. Tax Cases 161, 166-167; *Appeal of Fibreboard Products, Inc.* (Feb. 17, 1959) 7 Cal. Tax Cases 240, 241; *Appeal of Crown Zellerbach Corporation* (Feb. 17, 1959) 7 Cal. Tax Cases 243, 244; *Appeal of American President Lines, Ltd.* (Jan. 5, 1961) 8 Cal. Tax Cases 285, 289-290. See Wahrhaftig, pp. 66-68.) We have held that Fibreboard's 1956 investment income was subject to specific allocation because it was derived from a California "source" under section 23040 and was therefore to be included in the measure of appellant's franchise tax under section 25101. We first note that none of the above-cited deci-

---

[7]The State Board of Equalization considers and acts upon appeals from determinations of the Franchise Tax Board. (§§ 18593-18596, 19057-19061.1, 25666-25667, 26075-26077.)

[8]This citation, and each of those which follow under the title "Appeal of . . . ," refers to a decision of the State Board of Equalization and to the source which contains the full text of the respective decisions cited. For abstracts of such decisions, see State Tax Reporter, California (Commerce Clearing House, Inc.); State and Local Taxes, California (Prentice-Hall, Inc.); Revenue Laws of California Annotated (State Board of Equalization 1967) 1350-1351.

sions of the State Board of Equalization supports a contrary conclusion. In all but four of them, the board was dealing with a foreign corporation which carried on a unitary business in California but which had no domicile here; the question was not whether the income should be specifically allocated by situs under section 23040 (which could not occur in the absence of local domicile), but whether this state could reach the income by formula allocation or not at all; and section 23040 did not apply.

Among the four exceptions mentioned, the state board held in a single case that income from intangibles was unitary—and subject to formula allocation—where the intangibles "constituted an integral part" of the unitary business of a California-domiciled corporation. (*Appeal of Marcus-Lesoine, Inc. supra,* 2 Cal. Tax Cases 218 at p. 219.) But section 23040 did not require an opposite result by statutory mandate in that case because the income involved was earned in the years 1933, 1934 and 1935 (*ibid.*); section 23040 was not enacted until thereafter, when its language first appeared in section 10 of the Corporation Income Tax Act of 1937. (Stats. 1937, ch. 765, § 3, p. 2184.)

In each of the other three decisions cited above, the income in question was earned after the enactment of section 23040. In each of them, the taxpayer was a foreign corporation which engaged in a unitary business in California, and domiciled here, and earned the income from securities held as investments. In each case the State Board of Equalization held that the income was specifically allocable to California by reason of the corporation's local domicile. (*Appeal of Fibreboard Products, Inc., supra,* 7 Cal. Tax Cases at p. 241; *Appeal of Crown Zellerbach Corporation, supra,* 7 Cal. Tax Cases at pp. 243-244 [where, as in the present case, the funds invested were held as tax reserves of the unitary business]; *Appeal of American President Lines, Ltd., supra,* 8 Cal. Tax Cases at p. 289.)

It thus appears that the State Board of Equalization followed the mandate of section 23040 in each of the cited decisions where (1) the statute applied and (2) the corporation earning the investment income was domiciled in California. In each such case, the board drew the aforementioned distinction that income-producing investments were not an integral part of a unitary business which was conducted to do something other than to deal in investments. Appellant in effect challenges that distinction here, contending that Fibreboard's

securities *were* integral parts of its unitary business because the invested funds were held for unitary-business purposes.[9]

The factual validity of the distinction, however, is not before us. The essential point is that the purposes for which Fibreboard held the securities did not persuade respondent Franchise Tax Board to ignore the "source" of the income they produced, as predetermined by the fact of Fibreboard's domicile in this state, by the fact that the securities therefore had a California situs, and by the effect of section 23040 in consequence of both. Since the board's specific allocation of the income is supported by section 23040 (as well as by the three relevant decisions of the State Board of Equalization cited *supra*) the trial court correctly upheld it.

### The Expense Issue

The expense issue on the appeal arises by reason of the following facts: In early 1956 and until changed to its present name later, appellant's corporate name was Pabco Products, Inc. (On occasion hereinafter, we refer to appellant as "Pabco.") Pabco was engaged in the unitary business of manufacturing and selling various building material products, in California and in other states. In early 1956 Pabco and Crown Zellerbach Corporation ("Crown"), between them, held all of the outstanding stock in Fibreboard. There were three classes of stock, of which only one voted: of this class, Pabco and Crown held an equal number of shares.

In 1946, Fibreboard borrowed $15 million, at 1⅞ percent interest, to finance the construction of a pulp mill and the acquisition of timberlands. Both properties were held and used as producing elements of Fibreboard's unitary business. In 1949 Fibreboard borrowed $25 million at 3½ percent interest, used approximately two-thirds thereof to pay and retire the 1946 indebtedness, and spent the balance to complete the pulp mill. By 1956, Fibreboard owed about $18 mil-

[9]On this point, appellant relies in part upon a comment by one writer (Wahrhaftig, p. 68) who questions the decision in *Appeal of American Airlines, Inc., supra* (5 Cal. Tax Cases 161) upon similar grounds involving the intent of the taxpayer to withdraw the funds from the unitary business, or not, for the purpose of *making an investment unrelated to it. American Airlines,* however, is in the abovementioned category of State Board of Equalization appeals in which section 23040 did not apply because the taxpayer was not domiciled in California. (*Id.,* at pp. 166-167.) Accordingly, we do not read Mr. Wahrhaftig's comment as suggesting that the taxpayer's intent should override the effect of section 23040 where its domicile is in this state.

lion on the 1949 obligation. In a somewhat similar historical progression involving successive borrowings to finance and refinance elements of its unitary business, Pabco developed an indebtedness which amounted to $10.5 million by 1956.

In 1956 Fibreboard borrowed $65 million, which it used for three purposes: (1) to redeem (for $37.8 million) the Fibreboard stock held by Crown, thus making Pabco its (Fibreboard's) sole stockholder; (2) to retire, for $18,703,500, the balance of its debt incurred in 1949 as described above; and (3) to loan $8,496,500 to Pabco, which the latter used (with $2,003,500 also supplied by Fibreboard, but which was not part of the $65 million borrowed) to retire the $10.5 million it had incurred in 1955 as described above.

As part of the detailed arrangements which were worked out in connection with the entire 1956 transaction, Pabco was to guarantee Fibreboard's notes for the $65 million and to issue warrants for the purchase of its (Pabco's) stock. The latter proposal required amendment of Pabco's certificate of incorporation. As this in turn required the consent of the majority of its stockholders, Pabco submitted the entire transaction to them for approval at a stockholders' meeting held on January 9, 1956.

In a proxy statement published with notice of the January 9 meeting, Pabco summarized all of the foregoing facts and the entire Pabco-Fibreboard-Crown transaction in detail, stated the reasons that it had been proposed, and extensively discussed the past, present and future of both Pabco and Fibreboard. Copies of the proxy statement and of its accompanying exhibits are included in the parties' stipulation of facts: we hereinafter refer to it again.

In borrowing the $65 million in the 1956 transaction (which was thereafter executed in full), Fibreboard incurred and paid $2,688,722 in "loan expense." The expense issue on the appeal involves the treatment of this item as a deduction for purposes of appellant's franchise tax as measured by Fibreboard's net income for 1956.

In the case of a corporation engaged in a unitary business partially carried on in California (as Fibreboard was engaged), a business expense incurred by it and allowable as a deduction under California law[10] is treated as a unitary deduction if it is "related" to the production of unitary

---

[10]The parties agree that the $2,688,722 loan expense item in question was an allowable deduction under California law. (§ 24343, subd. (a): § 24344.)

income, as a nonunitary deduction if not. (Committee Report, p. 40; Keesling and Warren, pp. 44-45.)

A unitary deduction is subtracted from gross multistate unitary income to produce the net income figure of which *part* is then allocated to California and included in the measure of the corporation's franchise tax. (§§ 24271, 24341, 23151.) A nonunitary deduction, if available to the corporation in California by reason of its domicile here, is subtracted *in full* from the net income figure after the formula allocation of its unitary income: the result is the measure of the tax.

In the present case respondent Franchise Tax Board treated Fibreboard's $2,688,722 loan expense as a unitary deduction. This had the effect of disallowing it as a deduction from the 68.904 percent of Fibreboard's net unitary income allocated to California for 1956 (see fn. 6, *ante*); of requiring that it be deducted from Fibreboard's gross multistate income before making the 68.904 percent formula allocation; and of producing, *mutatis mutandis*, a higher measure of appellant's California franchise tax for 1957. Appellant, bringing this action, challenged the board's treatment of the expense item. We hold, as did the trial court, that the board's treatment was correct.

We have seen that, as a result of its being treated as unitary or nonunitary as the case may be, a deduction is in effect "allocated" to California—in whole or in part—in much the same way as income is allocated. Although the parties do not dispute this observation, we make it in order to point out that the "allocation" of a deduction is the practical result of an alternative arithmetical process, not of a "source" which may—or not—be determined by "situs" as may occur with income under section 23040. As the quoted terms are used in income allocation, an expense item has neither. "Source," "situs," and section 23040, therefore, are not involved in this discussion: the question is whether or not Fibreboard's loan expense was a unitary deduction. The answer depends upon whether Fibreboard's purpose in borrowing the $65 million was "related" to the production of its unitary income (Committee Report, p. 40): i.e., to its unitary business.

Appellant, citing the several purposes for which the borrowed money was used, argues that the stock redemption purpose was "unrelated" to Fibreboard's unitary business because the transfer of stock relates to a corporation's ownership but not to the operation of its business; that the refinanc-

ing of Fibreboard's 1949 debt was "unrelated" to its unitary business because it was "to pay up earlier borrowings" whose original (1946) unitary purpose, if any, had disappeared in the 1949 refinancing at a different (and higher) interest rate; and that lending money to Pabco for the refinancing of its own indebtedness was "unrelated" to Fibreboard's unitary business because the latter was carried on to manufacture and sell paperboard, not to lend money. Since none of these activities as such was "related" to the unitary business, appellant concludes that the cost of borrowing the money was nonunitary.

This argument, however, confuses (1) the several uses to which the $65 million was put with (2) the purpose for which Fibreboard borrowed it. Examining the Fibreboard-Pabco-Crown transaction in its full dimensions, we conclude that Fibreboard borrowed the $65 million for a *single purpose* which was "related" to its unitary business.

Pabco's proxy statement (some details of which we hereinafter quote in pertinent part) shows that Fibreboard borrowed the money to finance a complete integration of its unitary business with Pabco's. The venture was proposed to give Pabco "a source of supply of paperboard," to be used both "in combination" with Pabco's products and in their "packaging," which meant that Fibreboard would thereby acquire a market for the products of its unitary business. The venture was also to bring about "integration of the management and administrative facilities"[11] of the two companies, which would clearly affect Fibreboard's unitary business and give it the benefit of "substantial savings and economies" to be realized. Although Pabco's interests were a principal objective of the transaction, it was unmistakably conceived to further Fibreboard's unitary business as well.

From the full context of the stipulated facts concerning the Fibreboard-Pabco-Crown transaction, it also appears that the overall project was a comprehensive scheme of which Fibreboard's borrowing the $65 million, its stock redemption, the refinancing of its indebtedness, and the loan to Pabco for its own refinancing purposes (Pabco becoming Fibreboard's sole corporate parent and sharing its $65 million obligation to the

[11]To the point that, according to the proxy statement, merger of the two was "contemplated . . . in due course" in the interests of the "efficient management" of both. (The merger did, in fact, occur within a year after Fibreboard borrowed the $65 million.)

extent of guaranteeing its payment) were integral and inseverable elements. This being so, each part was "related" to Fibreboard's unitary business because the whole was so related, Fibreboard's cost of financing the transaction was a unitary deduction, and respondent Franchise Tax Board properly treated it as such.

The judgment is affirmed.

Devine, P. J., and Christian, J., concurred.