[Civ. No. 26262.  First Dist., Div. Two.  Jan. 19, 1970.]

AMERICAN PRESIDENT LINES, LTD., Plaintiff and Appellant, v. FRANCHISE TAX BOARD, Defendant and Respondent.

**COUNSEL**

McCutchen, Doyle, Brown & Enersen, Gordon M. Weber and Robert A. Blum for Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General, and John J. Klee, Jr., Deputy Attorney General, for Defendant and Respondent.

**OPINION**

**TAYLOR, J.**—American President Lines (hereafter taxpayer) appeals from an adverse judgment in its action for a refund of franchise taxes paid under

protest to respondent, Franchise Tax Board (hereafter board). The taxpayer contends that it is engaged only in interstate commerce and, therefore, is not subject to the state franchise tax; and, in the alternative, if subject to the tax, the board erred in allocating to California all of the taxpayer's interest from two statutory reserve funds required by federal maritime law.

The appeal is on the following stipulation of facts: The taxpayer is a Delaware corporation with its principal office in Wilmington, Delaware, and its commercial domicile (e.g., executive and general offices) in San Francisco. The taxpayer also maintains offices or commercial agencies in several other states and foreign countries. The taxpayer is a steamship corporation engaged in the transportation of passengers, property and mail by American flag vessels between U.S. ports and ports in foreign countries. From 1946 to 1956, the years here in question, the taxpayer carried no passengers, property or mail between California ports. It neither embarked nor disembarked any passengers nor loaded or discharged any freight in California except in interstate or foreign transports.

In addition to operating vessels for its own accounts, the taxpayer, during the years in question, for a fee, acted as the so-called "husbanding agent" for other organizations engaged exclusively in carrying passengers and freight in interstate and foreign commerce. The taxpayer also received fees for acting as general agent, time charter agent and berth agent for the government of the United States exclusively in connection with vessels operating in interstate and foreign commerce. As husbanding agent for other organizations and the United States government, the taxpayer's activities in California were limited to making arrangements in connection with interstate and foreign operations of vessels belonging to such other company or the government of the United States. These activities included soliciting and engaging cargo, issuing bills of lading, arranging to obtain stevedores, arranging necessary vessel repairs, obtaining bunker fuel and ships stores from suppliers, obtaining crews for the vessels when needed, making disbursements with funds provided by the principal and attending to other details involved in the operation of ships between California and other states and countries throughout the world.

The taxpayer, an American flag steamship operator, receives operating differential subsidies from the United States government under the Merchant Marine Act of 1936, and is subject to regulation under that statute, as well as its subsidy contract with the United States. Pursuant to the applicable United States maritime regulations, the taxpayer may place in its general funds and distribute to its shareholders no more than those earnings that are 10 percent of the capital necessarily employed in its business. All profits in excess of that 10 percent must be deposited in a "Special Reserve Fund." The Merchant Marine Act also requires the taxpayer to maintain a "Capital

Reserve Fund." This fund consists of the annual depreciation charges on the subsidized vessels, the proceeds from the sale of vessels, and other amounts the Maritime Administration deems necessary to assure the replacement of the taxpayer's fleet as it becomes obsolete. Withdrawals from both reserve funds can be made only with the permission of the Maritime Administration.

The Merchant Marine Act also permits the investment of some or all of the capital and special reserve funds in approved interest-bearing securities, on condition that the interest be deposited in the capital reserve funds. During the 10-year period here involved, the taxpayer received certain amounts of income from United States government securities held in the reserve funds, as well as interest from other investments held in the reserve funds.

In each of the 10 years here in question, the taxpayer filed timely California Corporation Income Tax returns based on its income. Thereafter, the board determined that: 1) the taxpayer's husbanding services and its activities as general agent, berth agent and time charter agent, were intrastate activities in California, subject to the payment of corporation franchise tax (Rev. & Tax. Code, § 23151) rather than the corporate income tax; 2) the interest received from United States government securities was, therefore, to be included in the measure of the taxpayer's taxable income;[1] and 3) the interest received on the reserve funds was wholly allocable to California as the commercial domicile of the taxpayer, rather than subject to any formula allocation between California and other states. The taxpayer paid the additional amounts due under protest and then commenced this action for a refund and determination of the issues presented. The trial court found for the board on all of the questions presented and entered judgment accordingly. This appeal ensued.

The first question presented is whether the trial court properly concluded that the taxpayer's husbanding activities in California and its activities as general agent, time charter agent, and berth agent were local intrastate activities and, therefore, subject to the franchise tax.

Section 23151 of the Revenue and Taxation Code provides that every corporation doing business within the limits of this state and not expressly exempt from taxation by the provisions of the Constitution of this state or by this part shall annually pay to the state, for the privilege of exercising its corporate franchise, a tax according to or measured by its net income. The taxpayer's activities here in question were clearly done within the

---

[1]The interest from securities is properly included in computing the taxable income for purposes of the franchise tax. Such income from securities, however, is not included in the computation of income for the corporate income tax.

limits of the state and not expressly exempt from taxation by the provisions of the state Constitution or the Revenue and Taxation Code. Accordingly, the taxpayer falls squarely within the language of the statute imposing the franchise tax. The taxpayer, however, argues that the activities here in question were merely an integral part of its interstate commerce activities and, therefore, it cannot be subject to the franchise tax because of the commerce clause[2] of the Constitution of the United States. We cannot agree.

■ Before a state tax or regulation can be declared unconstitutional under the commerce clause, it must be shown to "burden" the commerce involved, be it interstate or foreign (*Haliburton Oil Well etc. Co.* v. *Reily,* 373 U.S. 64, 69 [10 L.Ed.2d 202, 206, 83 S.Ct. 1201]; *Nippert* v. *Richmond,* 327 U.S. 416, 425 [90 L.Ed. 760, 765, 66 S.Ct. 586, 162 A.L.R. 844]) and it is not every burden that falls under the restraint implied from the grant of power to the federal government. The usual test is discrimination—i.e., whether the tax directly singles out a subject which is solely related to the protected activity (*American Smelting & Refining Co.* v. *County of Contra Costa,* 271 Cal.App.2d 437, 456 [77 Cal.Rptr. 570]).

■ As indicated in the factual summary above, the "husbanding services" that the taxpayer here performed for other shipowners for a fee included soliciting and engaging cargo, issuing bills of lading, arranging to obtain stevedores, arranging necessary vessel repairs, obtaining bunker fuel and ships stores from the suppliers, obtaining crews for the vessels when needed, making disbursements with funds provided by the shipowner principals, and attending to other details involved in the operation of the ships. These are local business activities, separate and apart from the interstate commerce engaged in by the shipowners to whom the service is sold by the taxpayer. Thus, there is no logical reason why these activities of the taxpayer should not be subject to the same franchise tax as all other corporations doing business within the state.

The fact that the taxpayer's local business activity is related to or even essential to interstate or foreign commerce is not relevant. A ship cannot run without fuel and could not operate without normal ships stores. Yet, it is well settled that those engaged in the business of supplying bunkering fuel and ships stores are considered to be in a business separate and apart from the commerce they serve and can be taxed accordingly (*Puget Sound*

---

[2]The commerce clause of the United States Constitution is cast not in terms of a prohibition against taxes, but in terms of a power on the part of Congress to regulate commerce. It is well established that the commerce clause is a limitation upon the power of the states (*Morgan* v. *Virginia,* 328 U.S. 373 [90 L.Ed. 1317, 66 S.Ct. 1050, 165 A.L.R. 574]; *Southern Pac. Co.* v. *Arizona,* 325 U.S. 761 [89 L.Ed. 1915, 65 S.Ct. 1515]).

*Stevedoring Co.* v. *Tax Com.,* 302 U.S. 90, 94 [82 L.Ed. 68, 72, 58 S.Ct. 72]; *Martin Ship Service Co.* v. *City of Los Angeles,* 34 Cal.2d 793 [215 P.2d 24]; *Shell Oil Co.* v. *State Board of Equalization,* 64 Cal.2d 713 [51 Cal.Rptr. 524, 414 P.2d 820], appeal dismissed 386 U.S. 211 [17 L.Ed.2d 870, 87 S.Ct. 973]). If the activities of corporations that sell fuel, supplies and repair services to vessels engaged in interstate and foreign commerce are considered to be engaged in intrastate commerce, it follows that those activities of the taxpayer that consist of arranging for such fuel, supplies and repair services for other shipowners are likewise intrastate commerce. The taxpayer here is in the same legal relationship to the shipowners for whom it performs these services as are the retailers of tangible personal property involved in the cases cited above. The only difference between the taxpayer here and retailers is that the former is selling a service rather than a specific item of personal property. This is a distinction without a difference. The taxpayer in receiving fees for the obtaining of bunker fuel and ships stores is doing nothing more than making a local sale of services. In fact, the taxpayer is selling its expertise and knowledge of local labor conditions, material, suppliers, ship providers, ship repair services, etc. These activities are carried on locally and constitute an income-producing activity, separate and apart from the taxpayer's operation of its own vessels in interstate and foreign commerce.

*Spector Motor Service, Inc.* v. *O'Connor,* 340 U.S. 602 [95 L.Ed. 573, 71 S.Ct. 508], cited by the taxpayer, does not support its position. In *Spector,* a Missouri corporation engaged in interstate trucking, operated two terminals in Connecticut as a gathering place for less than full truck load shipments. *Spector* is not at all analogous to the instant case and would not be so unless the trucking company there, in addition to its interstate trucking operations, had also earned income by performing services for other truckers, such as obtaining fuel for their trucks and arranging for drivers and necessary truck repairs.[3]

The taxpayer argues that the question was settled in its favor by *Texas Transport & Terminal Co.* v. *New Orleans* (1924) 264 U.S. 150 [68 L.Ed. 611, 44 S.Ct. 242, 34 A.L.R. 907], wherein the taxpayer was engaged in

---

[3]Furthermore, recent cases, such as *Roadway Express, Inc.* v. *Director, Division of Taxation* (1967) 50 N.J. 471 [236 A.2d 577], appear to limit *Spector* to a franchise tax on the privilege of carrying on or doing business in a state rather than the exercise of a corporate franchise. *Mid-Valley Pipeline Co.* v. *King* (1968) 221 Tenn. 724 [431 S.W.2d 277], reflects the current trend that a corporation may be subject to a tax for the privilege of exercising its corporate franchise even though all of its business is in interstate or foreign commerce. (See *General Motors Corp.* v. *Washington,* 377 U.S. 436 [12 L.Ed.2d 430, 84 S.Ct. 1564], and other cases discussed in 36 U. Chi.L.Rev. 186.) However, the instant case was tried on the theory of the distinction between intrastate and interstate activities and we do not need to reach the questions raised by the recent cases.

activities directly comparable to those here in question. In *Texas Transport,* the taxpayer, a steamship agency, was regularly employed as agent for four interstate steamship lines under a contract fixing its compensation on the basis of commissions, and occasionally represented other shipowners that were engaged solely in interstate and foreign commerce. The taxpayer rendered services such as issuing bills of lading under the name of the shipowner, arranging for stevedores, making disbursements, bunkering, nominating ships for carrying cargo, arranging for cargo delivery on the wharf, collecting freight charges, attending to immigration service and assisting generally with local customs and regulations.

The United States Supreme Court's view of the facts, in the actual rendition of its opinion in *Texas,* however, appeared limited to the freight soliciting activity of the taxpayer. The court said at pages 152 and 153 [68 L.Ed. at pp. 612, 613]: "This Court has had frequent occasion to consider and determine the effect of taxes of the same general character as that here involved, and, for present purposes, we find it unnecessary to do more than refer to the general and well established rule, which is that a State or state municipality is powerless to impose a tax upon persons for selling or seeking to sell the goods of a nonresident within the State prior to their introduction therein, *Stockard* v. *Morgan,* 185 U.S. 27; or to impose a tax upon persons for securing or seeking to secure the transportation of freight or passengers in interstate or foreign commerce. *McCall* v. *California,* 136 U.S. 104. The latter decision controls the present case. There the agent of a railroad company was engaged in San Francisco in the business of soliciting and inducing persons to travel from the State of California into and through other states to New York City, over the line of railroad which he represented. It was held that the business of the agent constituted a method of securing passenger traffic for the company, and therefore (p. 109) the tax was one 'upon a means or an occupation of carrying on interstate commerce, pure and simple.' The only difference between that case and this is that there the agent was engaged in seeking interstate passenger business, while here the agent was engaged in seeking interstate and foreign freight business. Plainly, as pointed out in the *McCall* case (p. 109), the principle is the same."

Thus, *Texas Transport,* regardless of its additional facts, seems to hold no more than that a company engaged solely in soliciting commerce for interstate and foreign commerce cannot be subject to a local business license tax. The taxpayer's activities in the instant case are not limited to soliciting interstate and foreign business but include on a regular, rather than an occasional basis, a wide variety of local activities on behalf of other shipowners. Significantly, the strong dissenting opinion in the *Texas Transport* case (written by Brandeis and also signed by Holmes), and set forth in

full in the footnote below)[4] focuses on the importance of these additional activities.

That these broader aspects of the taxpayer's activities cannot now be ignored is demonstrated by the later case of *Puget Sound Stevedoring Co.* v. *Tax Com.*, 302 U.S. 90 [82 L.Ed. 68, 58 S.Ct. 72]. There, the majority of the taxpayer's stevedoring activities were carried on by its own employees loading or unloading vessels engaged in interstate and foreign commerce. However, the taxpayer also collected and supplied longshoremen to other shipowners or masters without its directing or controlling the loading or

---

[4]"From the multitude of cases, this general rule may be educed. The validity of a state tax under the commerce clause does not depend upon its character or classification. It is not void merely because it affects or burdens interstate commerce. The tax is void only if it directly burdens such commerce, or (where the burden is indirect) if the tax discriminates against or obstructs interstate commerce. In this case there is no claim that interstate commerce is discriminated against or obstructed. The contention is that the tax imposes a direct burden. Whether the burden should be deemed direct depends upon the character of plaintiff's occupation and its relation to interstate transactions.

"The occupation tax laid by New Orleans is fixed in amount;—businesses being classified into several grades according to the amount of business done. The Texas Transport & Terminal Company falls within the highest grade—those whose receipts exceed \$100,000 a year—and, thus, it is taxed \$400 a year. The business is what is called a steamship agency. The main office is in New York City. It has branches in New Orleans and in five other ports of the United States. It is a wholly independent concern. No shipowner has an interest in it; and it has no interest in any ship which it serves. Some of these are regular ocean liners; others are casual tramp ships. The services rendered include, among other things, arranging with independent stevedore concerns for discharging and loading cargoes; arranging with independent dealers for bunkering, that is, buying fuel and oil; making provision for fitting ships for any special or peculiar cargo; making provision for compliance with the immigration and customs laws; and paying the ship's disbursements. For these, and the other services of soliciting cargoes, arranging for their delivery, and collecting payment for freight, the company is compensated. Usually the compensation is measured by a percentage on the gross freight charges collected. Sometimes it is a lump sum for each ship served. These comprehensive services require, for their efficient performance, the employment of a steamship agency, or its equivalent, whatever the home port of the ship, or the principal place of its owner's business.

"It is settled law that interstate commerce is not directly burdened by a tax imposed upon property used exclusively in interstate commerce, *Wheeling, P. & C. Transportation Co.* v. *Wheeling*, 99 U.S. 273, 284; *Old Dominion S. S. Co.* v. *Virginia*, 198 U.S. 299, 306; or by a tax upon net income derived exclusively from interstate commerce. *United States Glue Co.* v. *Oak Creek*, 247 U.S. 321; *Shaffer* v. *Carter*, 252 U.S. 37, 57; compare *William E. Peck & Co.* v. *Lowe*, 247 U.S. 165; or by an occupation tax, fixed in amount, although the business consists exclusively of selling goods brought from another State. *Wagner* v. *City of Covington*, 251 U.S. 95. On the other hand, the burden is deemed direct, where the tax is upon property moving in interstate commerce, *Champlain Realty Co.* v. *Brattleboro*, 260 U.S. 366; or where it lays, like a gross-receipts tax, a burden upon every transaction in such commerce 'by withholding, for the use of the State, a part of every dollar received in such transactions.' *Crew Levick Co.* v. *Pennsylvania*, 245 U.S. 292, 297; or where an occupation tax is laid upon one who, like a drummer or delivery agent, is engaged exclusively in inaugurating or completing his own or his employer's transaction in interstate commerce. *Robbins* v. *Shelby County Taxing District*, 120 U.S. 489; *Davis* v. *Virginia*, 236 U.S. 697.

unloading operations. As to the taxpayer's stevedoring activities through its own employees, the court held that the business of loading and unloading vessels in interstate and foreign commerce was itself interstate and foreign commerce and, therefore, not subject to the Washington franchise tax. However, the taxpayer's activities on behalf of other shipowners were held to be subject to the tax.

The court said at pages 94 and 95 [82 L.Ed. at p. 72]: "The business of appellant, in so far as it consists of supplying longshoremen to shipowners or masters without directing or controlling the work of loading or unloading, is not interstate or foreign commerce, but rather a local business, and subject, like such business generally, to taxation by the state.

"What is done by appellant in connection with activities of this order is similar in many aspects to the work of a ship's chandler, and even more closely similar to that of a labor or employment bureau. Such a bureau was considered in *Williams* v. *Fears*, 179 U.S. 270, 278, and its business found to be no part of interstate or foreign commerce, though the transactions of such commerce were increased thereby. Cf. *Federal Compress Co.* v. *McLean*, 291 U.S. 17, 21, 22; *Chassaniol* v. *Greenwood*, 291 U.S. 584. Little analogy exists between the activities now in question and those reviewed in *McCall* v. *California*, 136 U.S. 104; *Texas Transport & Terminal Co.* v. *New Orleans*, 264 U.S. 150; and *Di Santo* v. *Pennsylvania*, 273 U.S. 34. The contractors there considered were found to be acting as agents of foreign steamship companies with authority to make contracts binding on the principals and even running in their names. If appellant stands in that relation to the vessels that it serves in this branch of its activities, it has failed to make the fact apparent by the allegations of its bill. The effect of such a showing is not before us now." Similarly here, the taxpayer has not made such a showing.

In the recent case of *Dunbar-Stanley Studios, Inc.* v. *State of Alabama* (1969) 393 U.S. 537 [21 L.Ed.2d 759, 89 S.Ct. 757], the

"The New Orleans tax is obviously not laid upon property moving in interstate commerce. Nor does it, like a gross-receipts tax, lay a burden upon every transaction. It is simply a tax upon one of the instrumentalities of interstate commerce. It is no more a direct burden, than is the tax on the other indispensable instrumentalities; upon the ship; upon the pilot boat, which she must employ; upon the wharf at which she must load and unload; upon the office which the owner would have to hire for his employees, if, instead of engaging the services of an independent contractor, he had preferred to perform those duties himself. The fact that, in this case, the services are performed by an independent contractor having his own established business, and the fact that the services rendered are not limited to soliciting, differentiate this case from *McCall* v. *California*, 136 U.S. 104. If these differences are deemed insufficient to distinguish that case from the one at bar, it should be frankly overruled as inconsistent with the general trend of later decisions."

United States Supreme Court said at page 540: "In determining whether a state tax imposes an impermissible burden on interstate commerce, the issue is whether the local activity which is made the nominal subject of the tax is 'such an integral part of the interstate process, the flow of commerce, that it cannot realistically be separated from it.' *Michigan-Wisconsin Pipe Line Co.* v. *Calvert,* 347 U.S. 157, 166 (1954). If, for example, a license tax were imposed on the acts of engaging in soliciting orders or making deliveries, conflict with the Commerce Clause would be evident because these are minimal activities within a State without which there can be no interstate commerce."

In *Dunbar,* a North Carolina corporation, with its principal office and processing plant in Charlotte, North Carolina, contracted with J. C. Penney Company, who operated department stores in eight Alabama cities, for photographic services to be rendered by the North Carolina corporation's photographers, who were not residents of Alabama. The photographers were at the disposal of the local Penney stores, who advertised the services, invited parents to bring their children in to be photographed, etc. Each store took orders, arranged for a time for the sitting, provided a place, collected the money and then delivered the picture to the customer. The North Carolina corporation was paid a percentage of the receipts for the Penney stores in Alabama. The activities of the North Carolina corporation were limited to taking pictures, transmitting the exposed film to its offices in North Carolina where it was developed, printed and finished and then mailing the finished prints to the Penney stores in Alabama. The United States Supreme Court noted that the tax levied by the State of Alabama was on the distributable business of the photographer, not upon the soliciting of orders or the processing of the film, and held that the North Carolina corporation was engaged in a local activity subject to the Alabama tax.

The taxpayer cannot rely on the fact that it was an agent for the other shipowners and the federal government. The taxpayer, in making this argument, has blurred the distinction between agents who are employees or their principals and agents who are independent contractors. Although the taxpayer here acts for other shipowners and the United States government, its acts cannot be considered theirs (*Irvine Co.* v. *McColgan,* 26 Cal. 2d 160, 163-166 [157 P.2d 847, 167 A.L.R. 934]; *Automatic Canteen Co.* v. *State Board of Equalization,* 238 Cal.App.2d 372, 385-386 [47 Cal. Rptr. 848]).

The activities engaged in by the taxpayer in the instant case included obtaining crews for the vessels owned by other shipowners, arranging for

repair of vessels when needed, and making disbursements as required. The trial court properly concluded that these were local business activities, separate and apart from the commerce engaged in by the shipowner and the taxpayer's own interstate and foreign commerce activities and, therefore, subject to the franchise tax.

As we have concluded that the taxpayer is subject to the franchise tax, we reach the second question on appeal, namely, whether the board correctly allocated all of the taxpayer's income from the special statutory reserve funds required by federal maritime regulations entirely to California. The activities of the taxpayer as a steamship operator that take place both within and without the State of California are unitary in nature. Thus, the amount of net income generated by the operation of that business which is attributable to California sources is determined by formula allocation. The only issue here concerns the proper allocation of the interest income received by the taxpayer from the securities held in the reserve funds. The board determined that the source of the interest income received by the taxpayer from the securities was the securities themselves and not the operation of the unitary steamship business. Accordingly, in computing the taxpayer's tax liability, the board allocated all of the interest income to the taxpayer's commercial domicile, California. The taxpayer contends that this interest income should be treated like its income from the steamship business and allocated by the same formula.

The California tax is measured by that portion of a corporation's net income that is "attributable to sources within the state" (Rev. & Tax. Code, § 25101). The approach generally followed by the board is that in most situations, the source of interest income is the intangible for which the income was paid unless the intangible has acquired a business situs elsewhere. The board further follows the rule that the situs of the intangible property is at the domicile of the owner (*Southern Pac. Co.* v. *McColgan,* 68 Cal. App.2d 48, 58, 68-69 [156 P.2d 81]). Intangibles owned by a foreign corporation doing business in California have a "taxable situs" here if the corporation, like the taxpayer in the instant case, maintains a "commercial domicile" in this state (*Id.* at pp. 62, 81).

The pertinent regulations of the board so provide and their application to a substantially identical fact situation was recently upheld by this court (Division Four) in *Fibreboard Paper Products Corp.* v. *Franchise Tax Board,* 268 Cal.App.2d 363 [74 Cal.Rptr. 747]. *Fibreboard,* like the taxpayer in the instant case, was a Delaware corporation engaged in a unitary business in California and other states, with its commercial domicile in California. Fibreboard received interest income from securities held in reserve accounts for losses against which the unitary business did not carry commercial insurance. This court held that the interest income was not

part of the operating income of the unitary business and accordingly was not part of the unitary income subject to formula apportionment. We see no valid legal or factual distinction in this respect between *Fibreboard* and the instant case. *Fibreboard* is in complete accord with prior California appellate decisions and also discusses and disposes of many of the cases cited by the taxpayer here. Accordingly, we conclude that the board properly allocated all of the taxpayer's interest income from the reserve funds to California.

The judgment is affirmed.

Shoemaker, P. J., and Agee, J., concurred.